KANSAS CITY SOUTHERN RAILWAY COMPANY *v.* UNITED STATES OF AMERICA AND THE INTERSTATE COMMERCE COMMISSION.

APPEAL FROM THE UNITED STATES COMMERCE COURT.

No. 571.    Argued October 29, 30, 1913.—Decided December 1, 1913.

The constitutional validity of the provisions in § 20 of the Act to Regulate Commerce of February 4, 1887, c. 104, 24 Stat. 379, as amended by the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584, giving the Interstate Commerce Commission authority to prescribe the methods by which interstate carriers shall keep accounts, has already been sustained by this court. *Interstate Commerce Commission v. Goodrich Transit Co.*, 224 U. S. 194.

The authority conferred upon the Commerce Court by the act of June 18, 1910, c. 309, 36 Stat. 539 (Judicial Code, § 207), with respect to enjoining or setting aside the order of the Interstate Commerce Commission, like the authority previously exercised by the Federal Circuit Courts, was confined to determining whether there had been violations of the Constitution, or of the power conferred by statute, or an exercise of power so arbitrary as virtually to transcend the authority conferred.

In enacting the Hepburn Act amending § 20 of the Act to Regulate Commerce, Congress recognized the essential distinctions between property accounts and operating accounts, and between capital and earnings, and that while prior to that time the practice of different carriers varied, uniformity in regard to the keeping of accounts was essential in the future for proper supervision and regulation.

*Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194, followed to the effect that there is no unconstitutional delegation of legislative power by Congress to the Commission in giving it authority to establish methods of accounts by the provisions of the Hepburn Act amending § 20 of the Act to Regulate Commerce in that respect.

The classification of accounts adopted by the Interstate Commerce Commission in regard to additions and betterments and to property and operating accounts are not so arbitrary or so entirely at odds with fundamental principles of correct accounting as to amount to an unconstitutional abuse of power.

In this case the carrier was not deprived of any of its property without due process of law because under the Commission's system of accounting it was permitted to carry into its property account only the excess of the full cost of improvements made off the line after deducting the estimated replacement cost of the abandoned portions of the track or because it was required to charge to operating expenses the estimated cost of replacing the abandoned sections.

Where, as in this case, all classes of stockholders of a carrier, whose dividends are affected by the method of charging betterments and repairs, are not before the court, their rights cannot be determined in a suit between the carrier and the Commission in regard to such methods of accounts.

*Semble*, that requiring stockholders to forego dividends for a period so that the amount not divided be spent in bettering the condition of the property, thus giving them greater security for dividends in the future, does not amount to an unlawful taking of property within the meaning of the Fifth Amendment.

A carrier is not relieved from complying with regulations properly

made by the Interstate Commerce Commission because of agreements previously entered into; whatever had been done was subject to being displaced by the Commission under the powers conferred upon it by Congress.

The power given to the Commission by § 20 of the Act to Regulate Commerce, as amended by the Hepburn Act, to require the carrier to keep accounts as prescribed by the Commission, does not impose obligations upon the carrier as to the use of the proceeds of bonds but simply prevents such proceeds from being used in any manner without the fact appearing in the accounts.

Although the contention of the carrier that abandonments ought to be charged to profit and loss rather than to operating expenses may have weight, this court will not reverse the order of the Commission requiring them to be otherwise charged on the ground that it was an abuse of power.

Where it appears that the Commission has acted fairly within the grant of power constitutionally conferred upon it by Congress its orders are not open to judicial review.

204 Fed. Rep. 641, affirmed.

THIS is an appeal from a decree of the Commerce Court dismissing appellant's petition in an action brought to have certain regulations of the Interstate Commerce Commission relative to the method of keeping the accounts of carriers declared invalid and to enjoin the enforcement thereof. 204 Fed. Rep. 641. The regulations are contained in the "Classification of Expenditures for Additions and Betterments of Steam Roads," effective July 1st, 1909, and the First Revised Issue thereof, effective July 1, 1910.

The facts as set forth in appellant's brief may be summarized as follows:

Appellant is engaged in interstate commerce. Its main line is about 786 miles in length and extends from Kansas City to Port Arthur, on the Gulf of Mexico, traversing the States of Missouri, Kansas, Oklahoma, Arkansas, Louisiana and Texas. The road was built years ago, when the country was heavily timbered and sparsely settled, and the traffic was correspondingly small. The traffic would not

then support, nor could capital be obtained for, an expensively constructed road; and in consonance with the general practice in the development of the country, the road was built with rather heavy ruling grades. But it was not defectively or improperly constructed or located; it had substantially the same grades as other roads then constructed in the west; and it was adequate to serve the then existing needs of the country. A railroad with heavy grades is, of course, more cheaply constructed than a road of low grades. And a road of heavy grades is generally adequate in a new country, where the volume of traffic offered is small, the train-loads light, and the trains few.

The ruling maximum grade of appellant's line as originally constructed was 1 per cent.; and in the mountain district as high as 1.35 per cent. The evidence is undisputed that it was properly located, well constructed, and ample for the needs of the country. In the course of time, with the development of the country, and the resultant increase in traffic, whereby the limit of the road's capacity was being approached, the conditions warranted and rendered desirable such additions or improvements as would enlarge the road's capacity, and permit traffic to be moved more rapidly and economically.

Two methods of increasing the capacity of the road were presented: one by double-tracking, the other by lowering the grades and thus permitting traffic to be moved more rapidly. The road was in active competition with powerful rivals operating in the same general territory; among them, the Southern Pacific, the Missouri, Kansas and Texas, the Missouri Pacific, the St. Louis Southwestern, the Texas and Pacific, the St. Louis and San Francisco, the Atchison, Topeka and Sante Fe, and the Rock Island. The character of the road as a trunk line, having a long average haul and the prevalence of low class traffic,—timber, coal, oil and like commodities—necessarily entailed a low average freight rate; its average rates per ton

per mile being lower than those of any of it's competitors above named.

Under these conditions the management found that the most desirable plan was to lower the grades of the road, and thus to increase its capacity, procure economy in operation and render better service. to the public. Two methods of reducing the grades at various points along the line were presented: one by raising or lowering the road-bed on the existing right of way; the other by the construction of short sections of new road in substitution for portions of the road, in instances where the same result could be thus obtained at less cost. The program of improvement contemplated, therefore, not only many changes on the original right of way, but also a number of changes by the substitution of short sections of road on new ground, where that method was more economical.

The first six sections of the road where new locations were utilized are covered by the petition herein. Other similar changes are being made as the work proceeds, which will cover several years and is estimated to cost $3,000,000. The road at these six points was in no way worn out, was fully maintained, and was capable of performing for an indefinite term the function for which it was originally constructed. All of these changes are being made for the purpose of increasing the capacity of the line, of securing economy in operation, and of rendering improved service to the public.

At the six sections of the road in question it was found by the estimates of the engineers that the cost of securing the required gradient upon the original roadbed would be $1,230,318.99; but that the same result could be obtained by means of re-locations upon adjacent land for a net expenditure of $629,399.74.

The actual expenditure on these six new locations, as ascertained on completion of the work (after the filing of the petition) was $763,798; and the testimony shows

that had the work been done on the original roadbed the cost would have been increased over the estimates in an equal or greater proportion; the variation being due to increase in the cost of labor, materials, etc. For present purposes, the figures set forth in the petition are adopted.

The grade revisions at the six sections of line involved herein having been completed by removing the tracks to adjacent parcels of ground, which were procured and substituted for the original parcels, the use of the latter parcels was, of course, discontinued.

The expenditure required to improve the property by bringing it to the desired grade of five-tenths of one per cent. being deemed a capital expenditure, appellant's directors determined to finance the work by applying to it the proceeds of a bond issue. It is claimed to have been necessary to finance the improvements in this way if they were to be made at all, because the appellant did not have current earnings available for these improvements, and could not have financed its program, involving the revision of about forty-one per cent. of the entire line and an ultimate expenditure of several million dollars, in any other way than by raising capital for that purpose through the issuance of bonds.

Appellant, in order to raise funds for this and certain other purposes, made an issue of bonds secured by a second mortgage on its property. This was duly authorized by the directors and stockholders in the month of June, 1909; a portion of the bonds was sold and an initial sum of $1,250,000 thus obtained became applicable to the improvements referred to in the petition and other improvements in the grade. Additional bonds have since been issued as the work has proceeded.

In 1907, appellant began the payment of dividends at the rate of 4% per annum upon its preferred stock, the total amount of which was $21,000,000, and has continued to pay such dividends each year until the present time.

These dividends are non-cumulative and are payable only out of the earnings of the current year. The fact that appellant had paid its dividends for several years was a factor in its credit. Preferred dividends having been established, it is claimed that their discontinuance would have affected the credit of the road so seriously that it would have been unable except on prohibitive terms to dispose of additional bonds as further money was required from time to time during the progress of the work. It is further claimed that appellant was able to finance its improvements only out of the proceeds of a bond issue; and that it could not have financed them at all except by adopting the economical method of making a considerable part of the grade reductions by means of changes off the line of the right of way.

Appellant having paid the cost of the six improvements out of its issue of bonds, was confronted with the regulations of the Commission bearing on the method of recording the transaction in its books of account. Except for those regulations, it is said that the full cost of the improvements would have been charged to the account of "Additions and Betterments"—a subdivision of the property accounts—and credited to the proceeds of the bonds, because that sum had been expended for additions and betterments, and because the bonds had supplied the funds. In the balance sheet the "Assets" would have shown an increment of approximately $629,399 under the subdivision of Additions and Betterments, and, *per contra,* the "Liabilities" would have shown a corresponding increase under the subdivision of Bonds.

Under the regulations in question, it was found that if the improvements had been made on the original right of way, the entries would have been made as above indicated. But, with respect to improvements made off the right of way, different treatment was prescribed. Here the appellant was not permitted to carry into its property

accounts the full cost of the improvement, but was required first to deduct from the cost thereof the estimated replacement cost of the portions of track no longer used, the difference only being carried into the property accounts, and a sum equal to the estimated cost of replacing the old sections of track being charged to the operating expenses of that year.

The text of the Classification of Additions and Betterments relative to revisions made on the original line is as follows: "Grade Revisions.—(Reduction of grades by cutting down summits and raising sags without materially changing the alinement). The amount to be charged to this account is the cost of additional grading done, including as a portion of such cost the rent and cost of operation of steam shovels and work trains; building temporary tracks for steam shovels and grading outfits; tools, etc., used in the work; raising or lowering existing bridges; increasing the length of culverts and replacing riprap at culvert ends; changing grade crossings for farm or country roads, highways, and streets, including crossing gates, highway crossing alarms, and watch houses."

Relative to changes off the original line the regulation is as follows: "Changes of Line.—(Construction of new lines for the purpose of improving grade or alinement). The amount to be charged to this account is the difference between the cost of the new line and the cost of replacing in kind the line abandoned, exclusive of right of way."

The General Instructions contained in the Classification supplement these rules and prescribe charges to Operating Expenses as follows:

"5. In case it becomes necessary directly in connection with betterment or improvement work to abandon any property, the cost of replacing the abandoned property in kind, plus the cost of removal but less the value of salvage, should be charged to the appropriate accounts under Operating Expenses. In case, however, the amount so

chargeable is large, and its inclusion in a carrier's operating expenses for a single year would unduly burden the operating expense accounts for that year, the carrier may, if so authorized upon application to the Interstate Commerce Commission, charge such cost to the Property Abandoned account provided in the Form of General Balance Sheet Statement, or to the reserve account mentioned in paragraph 6.

"6. When property is abandoned and not replaced, the original cost (estimated, if not known) should be credited to the appropriate additions and betterments accounts and charged, less salvage, to Profit and Loss Account, to which should also be charged all incidental expenses directly connected with the abandonment. If so authorized upon application to the Interstate Commerce Commission, however, a carrier may set up depreciation accounts under 'Maintenance of Way and Structures' for the purpose of creating a reserve to which (instead of Profit and Loss) should be charged the original cost, less salvage, of the property (other than land or equipment) abandoned, and all incidental expenses directly connected with the abandonment."

These are the regulations as they appeared in the Classification of 1909. In the First Revised Issue (1910) there were some slight changes, but none now important.

To restrain the enforcement of the regulations so far as they required or tended to require appellant to charge against its earnings the estimated replacement value (less salvage) of the six parcels of railroad line that were abandoned as an incident to grade reduction as above set forth, was the principal object of the suit.

The petition sets forth the following as a second ground of complaint. As a part of its program of improvements, appellant is engaged in erecting a new and enlarged shop and terminal plant at Shreveport, upon a different location from that of the existing shop and terminal plant,

which latter are incidentally to be abandoned. It is claimed that the present shop and equipment are not worn out or obsolete, but are in good condition, and capable, with ordinary running repairs, of performing for an indefinite time the functions for which they were originally constructed. Appellant desires to charge the estimated value of the abandoned shop and terminal plant, amounting approximately to $100,000, against its accumulated surplus as represented in its profit and loss account. The regulations of the Interstate Commerce Commission relative to accounting, however, prohibit this charge, and require that the estimated replacement cost (less salvage) of the existing shop and terminal plant shall be charged to the Operating Expense Account. An injunction against the enforcement of the regulations in this regard also was prayed.

*Mr. Samuel Untermyer,* with whom *Mr. Walter C. Noyes, Mr. Arthur M. Wickwire* and *Mr. Irwin Untermyer* were on the brief, for appellant:

The power delegated to the Commission to prescribe the "form" of accounts cannot be extended so as to authorize the exercise of substantial powers of railway management not otherwise within its authority.

The regulations will curtail and may absolutely prevent the payment of dividends on the petitioner's preferred stock, which is non-cumulative and payable only out of the net earnings of each year.

The lawful determination of the petitioner to finance this improvement, costing $600,000, out of the proceeds of a bond issue is vetoed to the amount of $400,000 by the regulation which compels the petitioner to pay $400,000 of the expense out of operating revenue and to restore that amount to the bond account and return it to the trustee of the mortgage.

Property abandoned as an incident to permanent improvements is not an operating expense.

Petitioner contends that since the original locations were necessary in the development of the line, and were abandoned only as an incident to the improvement and development of the property, the cost thereof being a part of the cost of progress should remain in the property account as a part of the stockholders' investment.

The original investment was necessary in order that the second investment might be made.

The theory of depreciation advanced in support of the regulations has no application to the facts of this case.

Even the theory on which the respondents attempt to support the regulations, does not, when analyzed, justify a charge to operating expenses, but at most, a charge to profit and loss.

Since the Act to Regulate Commerce penalizes the keeping of any other accounts, records or memoranda than those prescribed by the Commission, and since the act requires that the annual reports shall show in detail (1) the cost and value of the carrier's property; (2) the amounts expended for improvements each year; (3) the operating and other expenses and (4) the balance of profit and loss, the Commission cannot promulgate rules which would leave the carrier without a true record of the facts to be included in the annual reports.

If, under any circumstances, Congress had power to determine that accounts should be so kept as to include in operating expenses an item which is not an operating expense, and to interfere with the internal management of common carriers and to deprive stockholders of their dividends, the determination of such a public policy involves the exercise of discretionary legislative functions incapable of delegation to the Interstate Commerce Commission.

Since the regulations in question compel the petitioner to make false entries in its accounts and thereby deprive the preferred stockholders of dividends to which they are

lawfully entitled, the regulations are in violation of the Fifth Amendment to the Constitution of the United States.

In support of petitioner's contentions see *Charlotte, C. & A. R. R. Co.* v. *Gibbes,* 142 U. S. 386; *Fordyce* v. *Omaha, Kansas City & E. R. R.,* 145 Fed. Rep. 544; *Goodrich Transit Co.* v. *Int. Comm. Com.,* 224 U. S. 194; *Int. Comm. Com.* v. *Louis. & Nash. R. R. Co.,* 73 Fed. Rep. 409; *Int. Comm. Com.* v. *Chicago G. W. R.,* 209 U. S. 108; *Ill. Cent. R. R. Co.* v. *Int. Comm. Com.,* 206 U. S. 441; *Ill. T. & S. Bank* v. *Doud,* 105 Fed. Rep. 123; *Lackawanna Coal Co.* v. *Farmers' L. & T. Co.,* 176 U. S. 298; *N. Y., N. H. & H. R. R.* v. *Int. Comm. Com.,* 200 U. S. 361; *Pennoyer* v. *Connoughby,* 140 U. S. 1; *Railroad Tax Cases,* 13 Fed. Rep. 722; *S. C.,* 116 U. S. 138; *Southern Pac. Co.* v. *Int. Comm. Com.,* 219 U. S. 433; *Smyth* v. *Ames,* 169 U. S. 466; *Santa Clara County* v. *Southern Pac. R. R. Co.,* 18 Fed. Rep. 385; *S. C.,* 118 U. S. 394; *Tex. & Pac. Ry. Co.* v. *Int. Comm. Com.,* 162 U. S. 197; *United States* v. *Verdi Copper Co.,* 196 U. S. 207; *United States* v. *Folk,* 204 U. S. 143; *Wisconsin &c. R. R.* v. *Jacobson,* 179 U. S. 287; *Un. Pac. R. R. Co.* v. *United States,* 99 U. S. 402; *Wood* v. *Guarantee Co.,* 128 U. S. 416.

*Mr. Assistant Attorney General Denison,* with whom *Mr. Thurlow M. Gordon,* Special Assistant to the Attorney General, was on the brief, for the United States:

In requiring that abandoned property (over and above salvage) should not be continued as an asset, the Commission does not act arbitrarily or injuriously. *Int. Comm. Com.* v. *Goodrich Transit Co.,* 224 U. S. 194; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Minnesota Rate Cases,* 230 U. S. 352; Physical Valuation Act, 37 Stat. 701.

Nor did the Commission act arbitrarily and injuriously in requiring that property abandoned in connection with improvements should be charged off through operating expense instead of through surplus.

The policy of the Commission is to allow an indulgence to the railroads by permitting them to maintain a basis for higher rates until the abandoned property has been paid for.

Obsolescence is depreciation and a proper and authoritatively recognized part of the definition of "operating expense." *Cumberland Tel. Co.* v. *Louisville*, 187 Fed. Rep. 637; *Columbus Light Co.* v. *Columbus* (Whitten, Valuation of Pub. Ser. Corp., § 450); *Eastern Case, Re Advances in Rates*, 20 I. C. C. 243; *Int. Comm. Com.* v. *Goodrich Transit Co.*, 224 U. S. 212; *Holyoke, Massachusetts, Purchase Case* (Whitten, § 454); *Knoxville* v. *Water Co.*, 212 U. S. 1; Montgomery on Auditing (ed. 1912), p. 319; *Brooklyn Heights R. R. Co.* v. *Tax Commissioners*, 69 Misc. (N. Y.) 646; *Queens County Water Co.* v. *Woodbury*, 67 Misc. (N. Y.) 490; *Queens Borough Gas Co.*, 18 N. Y. (reported in Whitten, § 487); *San Joaquin Co.* v. *Stanislaus County*, 191 Fed. Rep. 875; *Spokane &c. R. R.* (Whitten, § 457); *State Journal Printing Co.* v. *Madison Gas Co.*, 4 W. R. C. R. 501; (Whitten, § 486); *Third Avenue Reorganization*, 2 P. S. C. N. Y. July 29, 1910; (Whitten, § 463); also Whitten, §§ 450, 451, 452, 453, 458, 481.

Even if dividends should be lost owing to the abandonment of property, such loss is no reason for invalidating this order. *Motley's Case*, 219 U. S. 467.

But there is no reason to assume that the Commission will refuse to spread the charge so as to avoid such a result.

The required system of accounting does not "veto" the terms of the mortgage.

For other cases in support of contention of the United States see *Buttfield* v. *Stranahan*, 192 U. S. 470; *Columbus Ry. & Light Co.* v. *City of Columbus* (Whitten, § 450); *Cumberland Tel. & Tel. Co.* v. *City of Louisville*, 187 Fed. Rep. 637; *Eastern Case, Re Advances on Rates*, 20 I. C. C. 243; *Holyoke, Mass., Purchase Case* (Whitten, § 454);

*Illinois Central Case,* 215 U. S. 452; *Int. Comm Com.* v. *Goodrich Transit Co.,* 224 U. S. 194; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Minnesota Rate Cases,* 230 U. S. 352; Montgomery on Auditing, Theory, and Practice; *Motley's Case,* 219 U. S. 467; *People ex rel. Brooklyn Heights R. R. Co.* v. *Tax Commissioners,* 69 Misc. (N. Y.) 646; *People ex rel. Queens County Water Co.* v. *Woodbury,* 67 Misc. (N. Y.) 490; *Queens Borough Gas & Elec. Co.,* 2 P. S. C. 18 N. Y. (Whitten, § 487); *San Joaquin Co.* v. *Stanislaus Co.,* 191 Fed. Rep. 875; *Spokane & Inland Empire Elec. R. R.* (Whitten, § 457); *State Journal Printing Co.* v. *Madison Gas & Elec. Co.,* 4 W. R. C. R. 501 (Whitten, § 486); *Third Avenue Reorganization* (Whitten, § 463); *Union Pacific Case,* 222 U. S. 541; *United States* v. *Grimaud,* 220 U. S. 506; (Whitten, Valuation of Public Service Corporations,§§ 450, 451, 452, 453, 458, and 481).

*Mr. Charles W. Needham* for the Interstate Commerce Commission:

The power of Congress over interstate commerce includes regulating the forms of accounts and reports which have a substantial relation to the regulation of commerce.

Public records are exclusively under public control and Congress has power to vest Commission with authority to determine classification of accounts of common carriers.

The Commission's order is an extension of congressional action and in prescribing the classification of accounts, etc., the Commission was acting in purely a legislative capacity, nor did it act arbitrarily in requiring such classification.

By the Commission's system of classification there was no destruction of property nor was the administration of the funds affected.

Constitutional rights were not violated by the orders involved.

Depreciation is an operating expense.

Congress has spoken directly on this subject and made these regulations the law and there is no violation of the Fifth Amendment.

In support of these contentions see *Adair* v. *United States*, 208 U. S. 178; *Butte City Water Co.* v. *Baker*, 196 U. S. 126; *Buttfield* v. *Stranahan*, 192 U. S. 470; *Employers' Liability Cases*, 207 U. S. 497; *Second Employers' Liability Cases*, 223 U. S. 1; *Field* v. *Clark*, 143 U. S. 649; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Hippolite Egg Co.* v. *United States*, 220 U. S. 45; *Hoke* v. *United States*, 227 U. S. 308; *Ill. Cent. R. R. Co.* v. *Int. Comm. Com.*, 206 U. S. 441; *Int. Comm. Com.* v. *Goodrich Transit Co.*, 225 U. S. 194; *Light* v. *United States*, 220 U. S. 523; *Lottery Case*, 188 U. S. 353; *Prentiss* v. *Atlantic Coast Line*, 211 U. S. 210; *Smyth* v. *Ames*, 169 U. S. 466; *The Daniel Ball Case*, 10 Wall. 557; *Union Bridge Co.* v. *United States*, 204 U. S. 384; *Union Pacific R. R. Co.* v. *United States*, 99 U. S. 402; *United States* v. *Grimaud*, 220 U. S. 566; *Wayman* v. *Southard*, 10 Wheat. 142; Montgomery on Auditing, Theory and Practice (1912).

MR. JUSTICE PITNEY, after making the foregoing statement, delivered the opinion of the court.

The contention of appellant in the Commerce Court and in this court is, that the regulations of the Interstate Commerce Commission relative to the method of keeping the accounts of common carriers, so far as they are here questioned, are unreasonable, beyond the power or authority of either Congress or the Commission, and violative of the Fifth Article of Amendments to the Constitution of the United States, as being a deprivation of property without due process of law. It is claimed that the effect of enforcing the regulations under the circumstances of the case is to reduce the amount of net earnings applicable to dividends, and thereby cause an irreparable loss to the

preferred stockholders, whose dividends are non-cumulative and payable only out of the income of the current year; that the property accounts become inaccurate, because while appellant has actually expended something more than $600,000 in the improvement of its property, and its bonded indebtedness has been in fact increased by the like amount, the accounts will declare that for this expenditure the company has obtained a net accretion to its property of only a little over $200,000 ($629,399.74 less $386,484, or $234,747.74); that the Operating Expense Accounts will be improperly swollen by the inclusion therein of the sum of $386,484, to the deception of the stockholders and the investing public, and the impairment of the financial credit of the company; and that under the requirements of the Commission this sum of $386,484 cannot be charged to and finally taken out of the proceeds of the bonds, but must be charged to operating expenses, and thus taken from operating revenue, because of which (as is claimed) this amount, which has already been paid out of the proceeds of bonds, must ultimately be restored in cash to the bond account, and returned to the trustee or otherwise accounted for to the bondholders. As to the Shreveport shop and terminal plant that are to be abandoned, it is contended that it is unreasonable to require the cost of abandonment to be charged to operating expenses, and that this is a proper charge against the accumulated surplus, as represented in the profit and loss account.

The authority of the Commission rests upon § 20 of the "Act to Regulate Commerce" (February 4, 1887, 24 Stat. 379, c. 104, as amended by the Hepburn Act of June 29, 1906, 34 Stat. 584, cc. 3591).[1] The constitu-

---

[1] "Sec. 20. That the Commission is hereby authorized to require annual reports from all common carriers subject to the provisions of this Act, and from the owners of all railroads engaged in interstate commerce as defined in this Act, to prescribe the manner in which

tional validity of this legislation was sustained in *Inter-state Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194, 211, 214.

The authority conferred by Congress upon the Commerce Court (act of June 18, 1910; 36 Stat. 539, c. 309;

---

such reports shall be made, and to require from such carriers specific answers to all questions upon which the Commission may need information. Such annual reports shall show in detail the amount of capital stock issued, the amounts paid therefor, and the manner of payment for the same; the dividends paid, the surplus fund, if any, and the number of stockholders; the funded and floating debts and the interest paid thereon; the cost and value of the carrier's property, franchises, and equipments; . . . the amounts expended for improvements each year, how expended, and the character of such improvements; the earnings and receipts from each branch of business and from all sources; the operating and other expenses; the balances of profit and loss; and a complete exhibit of the financial operations of the carrier each year, including an annual balance sheet. Such reports shall also contain such information in relation to rates or regulations concerning fares or freights, or agreements, arrangements, or contracts affecting the same as the Commission may require; and the Commission may, in its discretion, for the purpose of enabling it the better to carry out the purposes of this Act, prescribe a period of time within which all common carriers subject to the provisions of this Act shall have, as near as may be, a uniform system of accounts, and the manner in which such accounts shall be kept.

\*     \*.     \*     \*     \*     \*     \*     \*     \*

The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to the provisions of this Act, including the accounts, records, and memoranda of the movement of traffic as well as the receipts and expenditures of moneys. The Commission shall at all times have access to all accounts, records, and memoranda kept by carriers subject to this Act, and it shall be unlawful for such carriers to keep any other accounts, records, or memoranda than those prescribed or approved by the Commission, and it may employ special agents or examiners, who shall have authority under the order of the Commission to inspect and examine any and all accounts, records, and memoranda kept by such carriers. This provision shall apply to receivers of carriers and operating trustees."

Judicial Code, § 207) with respect to enjoining or set-
ting aside the orders of the Commission, like the au-
thority previously exercised by the Federal Circuit Courts,
was confined to determining whether there had been
violations of the Constitution, or of the power conferred
by statute, or an exercise of power so arbitrary as vir-
tually to transcend the authority conferred. *Interstate
Com. Com.* v. *Illinois Central R. Co.,* 215 U. S. 452, 470;
*Interstate Com. Com.* v. *Union Pacific R. Co.,* 222 U. S.
541, 547; *Procter & Gamble* v. *United States,* 225 U. S.
282, 297; *Interstate Com. Com.* v. *Balt. & Ohio R. Co.,* 225
U. S. 326, 340.

As to the intent and meaning of § 20, it is first in-
sisted that the power conferred upon the Commission to
prescribe the forms of accounts, records, and memoranda
to be kept by the carriers, recognizes a distinction between
the form and the substance; and that while the Commis-
sion, in order to obtain full and accurate information con-
cerning the affairs of each corporation, must have power
to require any reports, schedules, and accounts necessary
to show the true financial condition of each carrier; yet
that the grant must by fair interpretation, and in order
not to amount to an unconstitutional delegation of legisla-
tive power, stop short of the point where the regulation
in its essence goes not to the form but to the substance
and involves interference with the internal affairs of the
corporation. We do not, however, think that any such
distinction between the form and the substance is ad-
missible with respect to the declared object of standardiz-
ing railroad accounts and obtaining therefrom full and
accurate information concerning the affairs of the respec-
tive corporations. The very object of a system of ac-
counts is to display the pertinent financial operations of
the company, and throw light upon its present condition.
If they are to truly do this, the form must correspond with
the substance. In order that accounts may be standard-

ized, it is necessary that the accounts of the several carriers shall be arranged under like headings or titles; and it is obviously essential that charges and credits shall be allocated under the proper headings—the same with one carrier as with another. Unless "Additions and Betterments," on the one hand, and "Operating Expenses," on the other, are to indicate the same class of entries upon the books of one carrier that they indicate upon the books of other carriers, there is no possibility of standardization. So far as such uniformity requirements control or tend to control the conduct of the carrier in its capacity as a public servant engaged in interstate commerce, they are within the authority constitutionally conferred by Congress upon the Commission. There is no direct interference with the internal affairs of the corporation; and if any such interference indirectly results, it is only such as is incidental to the lawful control of the carrier by the Federal authority and to this the rights of stockholders and bondholders alike are necessarily subject.

It is said, however, that the meaning of the term "operating expenses" was well defined at the time of the passage of the act of 1887, and that during the period intervening between the beginning of the work of the Commission thereunder and the passage of the Hepburn Act in 1906, the term had never been construed to include any charge for property abandoned in the course of improvements; and that this settled construction, upon familiar principles, must be deemed to have entered into the purpose of Congress when it reënacted the language of § 20 in the latter year, and added to it authority to the Commission to prescribe in its discretion the forms of accounts and a prohibition against keeping any others than those prescribed or approved by the Commission. But it will be observed that § 20, as originally enacted, authorized the Commission "in its discretion for the purpose of enabling it the better to carry out the purposes of this act,

[to] prescribe a period of time within which all common carriers subject to the provisions of this act shall have, as near as may be, a uniform system of accounts, and the manner in which such accounts shall be kept." Congress, when it enacted the Hepburn Act in 1906, must have known that the Commission had not as yet found occasion to enforce this provision; and at the same time may be deemed to have contemplated that the authority. then for the first time conferred upon the Commission to determine and prescribe the maximum rates to be charged by the carriers for the services to be performed by them, furnished a new and more cogent reason for establishing a uniform system of accounts.

The contention that the term "operating expenses" had a well-understood and defined meaning either recognized at the time of the passage of the act of 1887 or established by the constant practice of the Commission from that time until the Hepburn Act, so that the use of the term in the latter act amounted to an express limitation upon the grant of power to prescribe the forms of the accounts, is not well founded. Congress, in authorizing the Commission to prescribe a uniform system of accounts, recognized that accounting systems were not then uniform; and in reiterating this authorization in 1906, and adding a prohibition against the keeping of other accounts than those prescribed, manifested a purpose to standardize and render uniform the accounts of the different carriers with respect to matters that entered into property and the improvements thereof, on the one hand, and the current operations of the company, on the other. By the very terms of § 20, Congress at least outlined the classification of the carriers' accounts, for it required the annual reports to show "the amount of capital stock issued, the amounts paid therefor, and the manner of payment for the same . . . the surplus fund, if any, . . . the funded and floating

debts, . . . the cost and value of the carrier's property, franchises and equipments; . . . the amounts expended for improvements each year, how expended, and the character of such improvements; the earnings and receipts from each branch of business and from all sources; the operating and other expenses; the balances of profit and loss; and a complete exhibit of the financial operations of the carrier each year, including an annual balance sheet." By the same section the Commission was authorized to require these annual reports from all carriers subject to the Act, and to prescribe the manner in which the reports should be made, and for this and other purposes to require carriers to have "as near as may be, a uniform system of accounts, and [to prescribe] the manner in which such accounts shall be kept."

Plainly, the law-making body recognized the essential distinctions between property accounts and operating accounts, between capital and earnings; it recognized that the practice of different carriers varied in respect to these matters; and that no system of supervision and regulation would be complete without requiring the accounts of all the carriers to speak a common language.

There is here no unconstitutional delegation of legislative powers. The reasoning adopted in *Interstate Com. Com.* v. *Goodrich Transit Co.*, 224 U. S. 194, 210, etc., is controlling. And since, as just shown, uniformity in accounting is dependent upon the adoption and enforcement of precise classification, the authority to define the terms of the classification necessarily follows. It amounts, after all, to no more than laying down the general rules of action under which the Commission shall proceed, and leaving it to the Commission to apply those rules to particular situations and circumstances by the establishment and enforcement of administrative regulations.

It is contended that the regulations of the Commission, in respect to the matters now under consideration, are

so unreasonable and arbitrary as to constitute an abuse
rather than an exercise of the powers conferred by § 20,
and consequently that they ought to be set aside by ju-
dicial action.   This is not on the ground that the Com-
mission did not proceed with due deliberation and after
proper inquiry.   Respecting this, the record abundantly
shows that in the year 1906, and shortly after the passage
of the Hepburn Act, the Commission undertook, and for
nearly three years prosecuted a most thorough investiga-
tion into the current practice of the principal railroad
lines, procuring reports and recommendations from ex-
perts, and submitting tentative plans for the classification
of accounts to the executives of the railroad lines and to a
committee of accountants created by the Association of
American Railway Accounting Officers, which association
was made up of members representing practically every
important railroad in the country.

The present attack upon the classification as adopted
is, and must be, rested at bottom upon the contention
that the regulations embodied in it are so entirely at odds
with fundamental principles of correct accounting as
intrinsically to manifest an abuse of power.

There is evidence in the record that substantially the
same method of distributing charges for so-called "Addi-
tions and Betterments" between the Property Accounts
and the Operating Accounts is and has long been pursued
by important railroad carriers, and has received the sanc-
tion of at least one recent text-book writer,—Whitten,
Valuations of Public Service Corporations, §§ 450, 451,
458, etc.   Nevertheless, it is insisted with emphasis that
property abandoned as an incident to permanent im-
provements is not an operating expense, and, in effect,
that no matter what practice may be pursued by railroad
accounting officers, it cannot properly be treated as such.

We are thus brought back to the fundamental distinc-
tion between (a) the property or capital accounts, designed

to represent the investment of the stockholders, and to show the cost of the property as originally acquired, with subsequent additions and improvements; these assets being balanced by the liabilities, including the amount of the capital stock and of bonded and other indebtedness, with net profits or surplus, whether carried under the head of "profit and loss" or otherwise; and (b) the operating accounts, designed to show, on the one side, gross receipts or gross earnings for the year, and on the other side, the expenditures involved in producing those gross earnings and in maintaining the property, the balance being the net earnings.

Since the regulation of the railroad carrier by the public authority, and especially the fixing of the rates to be charged, depend primarily upon two fundamental considerations, (a) the value of the property that is employed in the public service, and (b) the current cost of carrying on that service, it is clear that the maintenance of a proper line of distinction between property accounts and operating accounts is essential to the execution by the Interstate Commerce Commission of the supervisory and regulatory powers conferred upon it by Congress.

Appellant contends, *inter alia*, that since the original locations were necessary in the development of its railroad line, and were abandoned only as an incident to the improvement and development of the property, the cost thereof, being as it is termed a part of the "cost of progress," should remain in the property account, as representing a part of the stockholders' present investment.

Support for this contention is sought in previous decisions of this court. In *Union Pacific R. Co.* v. *United States*, 99 U. S. 402, a decision that turned upon the meaning and effect of an act of July 1, 1862 for aiding the construction of the railroad (12 Stat. 489, c. 120), it was said, at p. 420: "As a general proposition, net earnings are the excess of the gross earnings over the expenditures de-

frayed in producing them, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves. It may often be difficult to draw a precise line between expenditures for construction, and the ordinary expenses incident to operating and maintaining the road and works of a railroad company. Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original construction of the works, and in the subsequent enlargement and improvement thereof." In *Illinois Central R. R.* v. *Interstate Commerce Commission*, 206 U. S. 441, the Commission had held (206 U. S. 449; 10 I. C. C. 544) that while repairs were properly chargeable to current operating expenses, yet expenditures for improvements and equipment "should not be taxed as part of the current or operating expenses of a single year, but should be, so far as practicable, and so far as rates exacted from the public are concerned, projected proportionately over the future." And in this court it was said (p. 462): "It would seem as if expenditures for additions to construction and equipment, as expenditures for original construction and equipment, should be reimbursed by all of the traffic they accommodate during the period of their duration, and that improvements that will last many years should not be charged wholly against the revenue of a single year." And, after pointing out that the case of the Union Pacific Railway Company in 99 U. S. had to do not with rates of transportation or the like, but with the construction of the words "net earnings" in an act of Congress, the court, in pointing out the difference between the position of the Government in that case and the position of a shipper of commodities in the case *sub judice*, said, with respect to the latter (p. 463):

"His right is immediate. He may demand a service. He must pay a toll, but a toll measured by the reasonable value of the service. The elements of that value may be many and complex, not always determinable, as we have seen, with mathematical accuracy, but, we think, it is clear, that instrumentalities which are to be used for years should not be paid for by the revenues of a day or year; and this is the principle of returns upon capital which exists in durable shape."

The expressions quoted were properly employed with respect to the questions then presented for decision. As expressions of the general principle, we see no occasion now to qualify them. In both cases it was recognized that in so complicated a matter as the construction, maintenance, and operation of a railroad line, it is difficult to define and perhaps more difficult to consistently apply a precise distinction between capital and expense accounts; and while the propriety of distributing improvement costs over a series of years was recognized, the impossibility of scientific accuracy in that regard was acknowledged. The question now is, whether the regulations of the Commission under attack do violence to these general principles—rather, it is whether those regulations are so clearly contrary to these and other applicable principles that they should be set aside as being in excess of the powers conferred by Congress upon the Commission.

We are unable to see that there is substantial inconsistency with principle, much less gross violation thereof. The contention of the appellant that property, originally acquired because necessary in the construction of the road, and afterwards abandoned only because rendered unnecessary by the improvement and development of the property, should remain in the property account as a part of the stockholders' investment, will be found, upon analysis, to rest upon the unwarrantable assumption that all capital expenditures result in permanent accretions to the

property of the company. This in effect ignores depreciation—an inevitable fact which no system of accounts can properly ignore. A more complete depreciation than that which is represented by a part of the original plant that through destruction or obsolescence has actually perished as useful property, it would be difficult to imagine. The fact that the original investment was necessary in order that the second investment might be made is not a conclusive test. Reference is made to the cost of the scaffolding used in the erection of a house, and discarded when the house is completed; and to the cost of the paper that goes to the waste-basket, rather than to the printer, in the preparation of a literary composition; but these are fanciful analogies, and do not assist us here, where the real question is not how shall original cost be ascertained, but, how shall subsequent depreciation in value be reckoned and accounted for?

In *Knoxville* v. *Water Co.*, 212 U. S. 1, this court had to do with a similar element of depreciation, and, after pointing out that such a plant as was there in question begins to depreciate in value from the moment of its use, and that before coming to the question of profit at all, the company was entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they should come to the end of their life, the court proceeded to say (p. 14): "If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon overissues of securities, or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under question the true value of the property then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past."

And since one of the manifest objects of Congress in authorizing the supervision and standardization of carriers' accounts, as is done in § 20 of the Interstate Commerce Act, was to enable the Commissioners to intelligently perform their duties respecting the regulation of carriers' rates for the services performed, and since it is settled that the property investment which is to be taken into consideration as one of the elements in fixing such rates is the property then in use (*Smyth* v. *Ames,* 169 U. S. 466, 546; *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 757; *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 442; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 41; *Minnesota Rate Cases,* 230 U. S. 352, 434, 454, 458), it is obvious that so far as the regulations of the Commission now under consideration discard the "cost of progress" theory, they need no further vindication.

It is insisted that if the appellant, having expended in round figures $600,000, secured by the sale of bonds for improvements, can be compelled to charge $400,000 of that amount to the operating expense of one year or to distribute it among the operating expenses of a series of years, and if it be forbidden to keep any other record representing the transaction, it will have in its possession no kind of record from which it can report accurately either the cost of its property or the cost of improvements or its operating expenses. This, we think, is a misapprehension of the effect of the regulations. They do not require appellant to falsify its books or to change in any way the evidential character of the original entries. The source of the money, and the disposition made of it as expended, may and should be correctly shown. The regulations do require that the contemporaneous abandonment of other property be likewise shown, and the replacement cost, less salvage, charged to the appropriate accounts under operating expenses. This, if observed, of course results

in enforcing a prescribed distinction between capital expense and operating expense. It does not require that the record of the expenditure be obliterated; but it does of course affect the results as they work out upon the balance-sheet. If this be fairly done, there is no transmutation of new property into operating expenses, but only an insistence upon the requirement that new property added shall not alone be the measure of the accretion to the property account, and that the depletion attributable to contemporaneous abandonment of other property shall likewise be reflected upon the books.

Stress is laid upon the fact that if the grade reductions in question had been made upon the line of the original right of way, even though made at double the expense, the cost would have gone into "additions and betterments," and would have stood as a permanent increment of assets in the property account; while with respect to similar improvements made off the line of the original right of way, appellant is not permitted to carry into the property account the full cost of the improvement, but must first deduct therefrom the estimated replacement cost (less salvage) of the portions of track no longer used, charging this to the account of operating expenses.

So far as the comparative expense of the different modes of improvement is concerned, little need be said. The accounting regulations do not seek to control railroad companies in the exercise of their discretion respecting what shall be done and how it shall be done, but only to systematize their accounts with respect to whatever is done. It is to be presumed that boards of directors will select that method of accomplishing a needed grade revision that shall be preferable from the engineering standpoint and suited to the financial condition and prospects of the company; not that they will adopt an inferior or more costly method of improvement because of the accounting requirements.

The distinction drawn between grade improvements "off the line" and those made "on the line" rests upon the view that the discarding of sections of the original line of road is a loss or depreciation that in correct accounting should be taken out of the property account. If this is to be done, its value must be charged, directly or indirectly, as an expense incident to the operation of the road. Whether it should be charged against the accumulated profits of previous years, as reflected in the profit and loss account, or against the profits of present and future years, may depend upon circumstances. The theory upon which the Commission has acted in formulating its regulations is fairly stated in its brief herein as follows: The abandonment of property incident to grade revision is "depreciation," and such depreciation is of two kinds,—(1) that which is not replaced in kind, and (2) that which is replaced by improved materials, track, or equipment. If a trunk line of road has a branch extending into a territory not served by its main line, and, finding the branch unprofitable, abandons it, taking up the track, without constructing any substitute to serve the same territory, the abandoned branch ceases to be an earning instrumentality; the stockholders can thereafter derive no profit from it; it has served its purpose, and only past operations have benefited from it. So far as the profits of past operations have not been distributed to the stockholders, they are represented in the profit and loss account, and therefore such an abandonment or depreciation is properly chargeable to that account unless a special depreciation account has been established in anticipation of such abandonments; and for such an account, provision is made in the regulations. The other kind of depreciation is the result of changes attributable to the inadequacy of the existing property to meet the demands of the future. The road or the structures have to be replaced with stronger or more efficient instrumentalities. Abandon-

ments occasioned by changes of this character are therefore chargeable to future earnings, for the reason that the improved condition of the road is not only designed to meet the demands of the future, but presumably will result in economies of operation, and so the resulting benefits will be reaped by those who hold the stock of the company in the present and in the future. The railroad company may, if it sees fit, anticipate general depreciations, and make provision for them by establishing a reserve for the purpose; but if no such provision has been made the abandonments should be taken care of by charging them to present or future operating expense. In case, however, the amount is so large that its inclusion in a carrier's operating expenses for a single year would unduly burden the operating expense account for that year, the carrier may, if so authorized by the Commission, distribute the cost throughout a series of years.

A statement of the theory is sufficient to show that the regulation is not arbitrary in the sense of being without reasonable basis. And there is evidence to show that the Commission was warranted in adopting it, as sustained by expert opinion and approved by experience.

One of the reasons for the distinction made in accounting between improvements made on, and those made off, the old right of way is that in the former case the improvements show themselves in the physical structures, and can be inventoried and appraised by witnesses; the deepening of cuts and increasing of fills, while involving some abandonments (and these under the regulations are to be taken out of the operating account), yet in the main are visible upon the ground, and capable of mensuration and appraisement. To the suggestion that cuts filled up and embankments reduced would not be thus manifest, it is sufficient to say that if such cases occur they must be most extraordinary. When a railroad is originally constructed, cuts and fills are made to overcome natural

inequalities of surface; if any undue grades are permitted to remain, it is usually because for reasons of economy cuts have been made less deep and fills less high than otherwise they would have been made. Therefore grade revisions upon the line of the original right of way are normally required for the purpose of removing summits in cuts and raising sags in fills; not *vice versa.*

It is said that the effect of the regulations, if complied with, is to deprive the preferred stockholders of a considerable part of the non-cumulative dividends from the net earnings of the company, to which they would otherwise be entitled. The preferred stockholders, as such, are not before the court, and this is not a proper occasion for determining their rights. Supposing, however, that the enforcement of the accounting system does require them to forego their current dividends, we do not concede that this amounts to an unlawful taking of their property. Assuming (as of course we must) that the management of the company has acted prudently in making these extensive improvements within a short time, instead of distributing them throughout a series of years, and without providing in advance any fund applicable to them, still it must be presumed that the improvements are necessary to the general welfare of the company, and will result in its increased prosperity, and therefore make better the assurance of dividends for the preferred stockholders in the future.

But, aside from that, the Interstate Commerce Act deals with the carrier in its capacity as a servant of the public, and as a distinct entity, amenable to the legitimate regulation of Congress and the Commission. If in this aspect the carrier is not unwarrantably injured or deprived of its property by the exercise of the regulatory powers, the operation of such regulations cannot be restrained on the ground of agreements made by the stockholders amongst themselves for apportioning profits to one or the

other class of stockholders. To admit this might materially hamper the Federal control over interstate carriers, and evidently would tend to render impracticable the standardization of methods of accounting.

Much stress is laid upon the situation that results from the circumstance that (as is claimed) these regulations were promulgated after appellant had mortgaged its property and issued bonds for financing the improvements in question. It is not contended that the regulations impair the rights of either party under the mortgage. The contention is that the company had the right to finance the full cost of the improvements out of the proceeds of a bond issue, and that the regulations amount in effect to a veto upon the action of the directors in this respect. Supposing this to be true, we are unable to perceive that the appellant is thereby relieved from compliance with the regulations. Whatever was done about authorizing the improvements and financing the cost from the bond issue was done subject to being displaced by the exercise of the powers conferred upon the Interstate Commerce Commission by the act of 1906. The regulations do not affect the administration of the borrowed money. It was borrowed *inter alia* specifically for use in "reducing grades to one-half of one per cent. on three full operating divisions, aggregating 41 per cent. of the total length of the line." And by the mortgage appellant covenanted to use the bonds and the proceeds thereof in calling in and redeeming an outstanding loan, "and for the general improvement of its property." In short, so far as appears, there is nothing in the regulations to prevent the appellant from devoting the money strictly to the purposes for which it was borrowed, although they do prevent the keeping of the accounts in such manner as to make it appear that the book value of the company's assets is enhanced to the full extent of the moneys disbursed in the improvements.

When it is said that the amount of $386,484, which under the requirements of the Commission must be charged to operating expenses, must for that reason be ultimately restored in cash to the bond account and returned to the trustee or otherwise accounted for to the bondholders, this does not mean that any obligation of that kind is imposed upon appellant by the classification. We are not referred to anything in the classification, in the provisions of the mortgage, or in the law, that imposes any such duty. What is meant (as we presume), is that if the operating expenses are increased and the operating revenue decreased by the amount mentioned, in accordance with the regulations, and the payment of dividends should nevertheless continue, the books would make it appear that the dividends were paid not from earnings but from the proceeds of the bonds. In other words, the regulations of the Commission prevent the proceeds of the bond issue from being used, in whole or in part, to maintain dividend payments *without that fact appearing upon the accounts;* and since it is improbable that appellant would be willing to have the accounts bear such an interpretation, it is probable that the proceeds of the bonds will not be employed for dividend purposes, and unless required for further improvements, may as well be returned to the trustee for the bondholders. Since one of the very purposes of establishing the accounting system is to deter the payment of dividends out of capital, the criticism, upon analysis, bears its own refutation.

The same may be said of the argument that enforcement of the regulations will impair the credit of appellant by diminishing apparent earnings, preventing continuance of dividends upon preferred stock and keeping down the aggregate value of "assets" upon the property accounts. Presumably the regulations have a tendency to place the accounting system upon a sound basis in these respects; and to accomplish this was one of the legitimate

objects at which Congress aimed in the enactment of § 20 of the Interstate Commerce Act.

It is further insisted that even the theory upon which the accounting regulations rest does not, when analyzed, justify a charge of abandoned property to operating expenses, but at most a charge to profit and loss. The suggestion apparently has force; but, upon consideration, we are unable to see that it furnishes ground for judicial interference with the course pursued by the Commission. Except for the contention (already disposed of) that the value of the abandoned parcels should be permanently carried in the property account as part of the cost of progress, it is and must be conceded that sooner or later it must be charged against the operating revenue, either past or future, if the integrity of the property accounts is to be maintained; and it becomes a question of policy whether it should be charged *in solido* to profit and loss (an account presumptively representative of past accumulations) or to the operating accounts of the present and future. If abandoned property is not charged off in one way or the other it remains as a permanent inflation of the property accounts, and tends to produce, directly or indirectly, a declaration of dividends out of capital. If it be charged off to the surplus account, it tends to prevent the declaration of dividends based upon a supposed accumulation of past earnings. If charged to operating expenses of the current and future years, it has a tendency to prevent the declaration of dividends from current earnings until the amount of the depreciation shall have been made up out of the earnings.

But, did we agree with appellant that the abandonments ought to be charged to surplus or to profit and loss, rather than to operating expenses, we still should not deem this a sufficient ground to declare that the Commission had abused its power. So long as it acts fairly and reasonably within the grant of power constitutionally con-

ferred by Congress, its orders are not open to judicial review.

What has been said respecting the enforced disposition of the charges for property abandoned in grade revision, applies as well to the abandonment of the present shop and terminal plant at Shreveport.

*Decree affirmed.*