**MISSOURI PAC. R. CO. et al. v. UNITED STATES et al.**

No. 1137.

District Court, E. D. Kentucky.
July 25, 1933.

Edward J. White and H. H. Larimore, both of St. Louis, Mo., for Missouri Pac. R. Co.

T. D. Gresham, C. M. Spence, and M. E. Clinton, all of Dallas, Tex. (Herbert Fitzpatrick, of Cleveland, Ohio, and Thomas J. Freeman, of New Orleans, La., of counsel), for Texas & Pacific R. Co.

George R. Hunt, of Lexington, Ky., for plaintiffs.

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

Daniel W. Knowlton, of Washington, D. C., for Interstate Commerce Commission.

Ben C. Dey, of New York City, J. H. Tallichet, Walter H. Walne, John P. Bullington, and Baker, Botts, Andrews & Wharton, all of Houston, Tex., Ed. P. Humphrey, of Louisville, Ky., and J. R. Bell, of Washington, D. C., for Southern Pacific Co.

Before MOORMAN, Circuit Judge, and COCHRAN and DAWSON, District Judges.

PER CURIAM.

This suit is brought by the Missouri Pacific Railroad Company and the Texas & Pacific Railway Company to set aside three orders of the Interstate Commerce Commission dated, respectively, January 12, 1932, March 14, 1932, and May 10, 1932. The first

one authorized the defendant the Southern Pacific Company to acquire control of the St. Louis Southwestern Railway Company, known as the Cotton Belt, and hereafter referred to as such, by purchase of its capital stock. The second made the first effective April 13, 1932. These orders were made under section 5 (2) of the Interstate Commerce Act (U. S. C. title 49 and 49 USCA § 5 (2), which empowered the commission to authorize an interstate carrier to acquire the control of another such carrier by the purchase of its stock, if such acquisition will be "in the public interest," and that "on such terms and conditions as shall be found by the Commission to be just and reasonable in the premises." The third assigned the Cotton Belt to System No. 16 Southern Pacific instead of to System No. 10 Illinois Central, to which it had been assigned by the Consolidation Plan adopted by the commission December 9, 1929. It was made under section 5(4) of that act (49 USCA § 5(4), which required the commission to adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems. At the time of the application for these orders and the making thereof, the Southern Pacific owned approximately 35 per cent. of the capital ·stock of the Cotton Belt, preferred and common, of equal voting power, which it began purchasing in 1929. The acquisition of the stock, preferred and common, which it was authorized to purchase would give it approximately 58 per cent. thereof. Jurisdiction of this suit by this court exists because the defendant the Southern Pacific Company is a Kentucky corporation and its principal place of business is in this district.

The relevant railroad situation involved was this: It consisted of two fields of transportation. One extended from St. Louis, Mo., and Memphis, Tenn., on the Mississippi, gateways to and from the East, generally westward to the Pacific Coast. The other from those same gateways, southwardly, to the Rio Grande Valley. The traffic carried in both fields was largely perishable products, vegetables and fruits, produced in Southern California and that valley, and was increasing in volume. In each field there were two routes of transportation—competitive, but more so in the latter. Of the two routes in the first-named field one may be described as the Southern Pacific, Texas & Pacific, and Missouri Pacific. The Southern Pacific owned and operated a railroad from El Paso,

Tex., to the Pacific Coast. Its mileage was extensive and covered the Pacific States consisting of New Mexico, Arizona, California, Oregon, Nevada, and Utah. At El Paso it connected with the Texas & Pacific, which ran east therefrom along the thirty-second north parallel through the northern part of Texas. That company was chartered by Congress in 1871 and was authorized to construct a railroad from Marshall, Tex., to El Paso and thence to San Diego, Cal., along such parallel. Thereafter and whilst it was in the process of constructing its railroad, the Southern Pacific located a line of railroad from Fort Yuma, Ariz., on the Colorado river to El Paso on the location of the Texas & Pacific and proceeded to construct it. Thereupon the Texas & Pacific brought suits in the territorial courts of Arizona and New Mexico against the Southern Pacific to enjoin such construction in which receivers were appointed. In 1881 this litigation was settled by a written agreement between Jay Gould, acting on behalf of the Texas & Pacific, and Collis P. Huntington, acting on behalf of the Southern Pacific, termed the Gould-Huntington agreement. It was filed in those suits and final decrees were entered therein embodying its terms. By that agreement it was provided that each of the two railroads should be operated in perpetuity for all purposes of communication, travel, and transportation, so far as the public and government were concerned, as one continuous line and that the Southern Pacific should carry all through business for the Texas & Pacific on as favorable terms as it carried traffic for the Galveston, Harrisburg & San Antonio Railroad Company, whose line extended east from El Paso. Thereafter the construction of each railroad was completed. That of the Texas & Pacific was extended from Marshall its eastern end to Texarkana, Texas-Arkansas. At Texarkana it connected with the Missouri Pacific whose line extended therefrom to Memphis and St. Louis. The latter at some time thereafter acquired control of the former through stock ownership, and ever since there has existed the through route between the Pacific States and those gateways above described as the Southern Pacific, Texas & Pacific, and Missouri Pacific. During the year ended June 30, 1930, the Texas & Pacific received from the Southern Pacific at El Paso 551,315 tons of freight, of which 63,999 tons were destined to points on its own line and 487,-336 tons were delivered to connections. Of the total tonnage 388,448 was perishable

products, of which 245,519 tons were delivered to the Missouri Pacific and 3,388 to one of its subsidiaries.

The other route in this field may be described as the Southern Pacific, Texas & New Orleans, and Cotton Belt, or, more briefly, the Southern Pacific and Cotton Belt. It came about in this way: The Texas & New Orleans Railroad Company, under leases from the Galveston, Harrisburg & San Antonio and other railroad companies, operated a railroad from a connection with the Southern Pacific at El Paso, along the course of the Rio Grande for some distance and thence through San Antonio and Houston to New Orleans, and branch roads extending therefrom north to Corsicana, Tex., and Shreveport, La. The Southern Pacific owned its entire capital stock and also the entire capital stock of its lessors, the owners of the railroad covered by the leases. Prior to the construction of the Panama Canal, the Southern Pacific operated a line of steamships between New Orleans and other ports on the Gulf of Mexico, and the North Atlantic ports. The lines of the·Texas & New Orleans were largely constructed and primarily developed for the handling of traffic between the Pacific and Atlantic Seaboards. With the opening of that canal this route became practically excluded from such traffic. The Texas & New Orleans at Corsicana and Shreveport connected with the Cotton Belt, which owned and operated a railroad through Texas, Louisiana, Arkansas, and Missouri to Memphis and St. Louis. Thus it was that this alternative route was made up of the Southern Pacific, Texas & New Orleans, and Cotton Belt. By reason of the Southern Pacific's ownership of the entire capital stock of the Texas & New Orleans and its lessors, their railroad was owned and operated solely for its benefit and it was, so far as the purposes of this case are concerned, the same as if it actually owned and operated it, so that the route may not inappropriately be described as the Southern Pacific and Cotton Belt.

The Southern Pacific, therefore, had an interest in each of these two routes. It, i. e., its line from El Paso to the Pacific States, was the western end of each route. Because of the larger haul, it had the greater interest in the Southern Pacific and Cotton Belt route. It owned, practically, the entire route from El Paso to Corsicana and Shreveport and 35 per cent. of the route therefrom to the Mississippi gateways. But this route was seriously handicapped by the fact that by Corsicana, the shortest way, it was 266 miles longer than the other route. This handicap was somewhat lessened by an agreement between the Southern Pacific, on the one hand, the Texas & Pacific and Missouri Pacific, on the other, that trains on the two routes should be operated on the same schedules, which caused the slowing up of traffic moving by the shorter route in order that traffic on the longer route might reach Memphis and St. Louis at substantially the same time. The abrogation of that agreement would leave this handicap in full force.

The two routes in the other field of transportation, referred to, may be described as the Texas & New Orleans or Southern Pacific and Cotton Belt, and the Missouri Pacific. The Texas & New Orleans also operated branch roads from its main line in eastern Texas south to the Rio Grande Valley, which, in connection with the branch roads extending north therefrom to Corsicana and Shreveport, heretofore referred to, formed a continuous line of transportation between the connection with the Cotton Belt at those points and that valley. The Texas & New Orleans operated these branch roads under leases from companies whose entire capital stock was also owned by the Southern Pacific. Thus was formed the Texas & New Orleans or Southern Pacific and Cotton Belt route in this field. That of the Missouri Pacific arose from the fact that its lines extended through Eastern Texas and Louisiana to the Rio Grande Valley. The Texas & Pacific had no interest in this route. The competition between these two routes in the nature of things was more severe than between the two routes in the other field. The Cotton Belt formed a part of each route in the two fields competing with the Missouri Pacific. Its interest, as is apparent, was, in each instance, with the route of which it formed a part. It was only through it that it could share in the traffic from and to the Pacific States and the Rio Grande Valley. The result was that the relations between the Southern Pacific and the Cotton Belt were friendly. At the time of the application there had existed for seventeen years a close traffic relationship between them. Practically they were unified. The effect of the granting of the application was to make the unification legal and permanent and render it so that programs of betterment might be planned and carried out. Such a unification would result in a saving on account of terminals of $408,087 for the first year and $338,087 for each year there-

after and enable surplus equipment on each road to be put in use.

There were many interveners in the proceeding before the commission. Those opposing the application were minority stockholders, four short line railroad companies, and five truck lines of which the most urgent were the Texas & Pacific and the Missouri Pacific. Many civil organizations intervened and almost unanimously approved the application. Much evidence on the questions involved was heard. The record covers 1,309 pages. Two commissioners dissented. No objecting interveners complained of the commission's action except the plaintiffs, really the Missouri Pacific. The commission found that the acquisition by the Southern Pacific of the control of the Cotton Belt by the purchase of its stock would be "in the public interest," and prescribed as a condition that it "should maintain and keep open all routes and channels of trade via existing gateways unless and until otherwise authorized by the Commission." In the course of the opinion it said: "The principal benefit to the public will arise from the inclusion of the Cotton Belt as a system with the Texas & New Orleans; such a unification will insure a strong competition for the Missouri Pacific in the Rio Grande Valley and will permit systematic handling of traffic to and from important Texas points from and to Memphis, St. Louis and points beyond. The Cotton Belt must depend principally upon bridge traffic for its continued existence and the applicant is best situated and constituted for furnishing such traffic. At the same time the communities served by the Cotton Belt will, under Southern Pacific Control, be assured of a strong transportation system."

The principal benefit to the public, referred to, was not a single one. It was not merely the insuring a strong competitor for the Missouri Pacific in the Rio Grande Valley, as plaintiffs would have it. It was made up of several items. It permitted systematic handling of traffic to and from important Texas points from and to Memphis and St. Louis and points beyond. It provided the Cotton Belt with bridge traffic necessary to its continued existence by the one best situated and constituted to furnish it. And the communities served by the Cotton Belt would be assured a strong transportation system.

■■ The grounds upon which this court is not empowered to set aside and enjoin an enforcement of an order of the commission are set forth in United States v. Berwind-

White Coal Min. Co., 274 U. S. 564, 580, 47 S. Ct. 727, 733, 71 L. Ed. 1204, in these words: "It is not for courts to weigh the evidence introduced before the Commission, Western Paper Makers' Chemical Co. v. United States, 271 U. S. 268, 271, 46 S. Ct. 500, 70 L. Ed. 941; or to inquire into the soundness of the reasoning by which its conclusions are reached, Interstate Commerce Commission v. Illinois C. R. R. Co., 215 U. S. 452, 471, 30 S. Ct. 155, 54 L. Ed. 280; Skinner & E. Corp. v. United States, 249 U. S. 557, 562, 39 S. Ct. 375, 63 L. Ed. 772; or to question the wisdom of regulations which it prescribes, United States v. New River Co., 265 U. S. 533, 542, 44 S. Ct. 610, 68 L. Ed. 1165. These are matters left by Congress to the administrative 'tribunal appointed by law and informed by experience.' Illinois C. R. R. Co. v. Interstate Commerce Commission, 206 U. S. 441, 454, 27 S. Ct. 700, 704 (51 L. Ed. 1128)." It follows that the only ground on which it can so proceed is that the commission has acted arbitrarily in some particular. As to what constitutes arbitrary action, in the case of Baltimore & O. R. Co. v. United States, 264 U. S. 258, 44 S. Ct. 317, 320, 68 L. Ed. 667, it was said: "To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action." It is likewise arbitrary for it to consider and base its action on facts not introduced in evidence. Interstate Commerce Commission v. L. & N. R. Co., 227 U. S. 90, 33 S. Ct. 185, 57 L. Ed. 431; United States v. Abilene & So. R. Co., 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016.

The plaintiffs urge five separate grounds as entitling them to the relief which they seek. They mainly rely on the first ground.

■■ 1. In their words, it is that the commission "gave no consideration to but arbitrarily ignored" "the Southern Pacific Texas & Pacific transcontinental route via El Paso," a "long existing channel of commerce." Concerning that route they say that it "has its sanction in a public policy inaugurated by Congress in 1866 and presently retained in interstate commerce law" and that "it was designed by Congress and unified by contract and court decrees; and it has functioned in interstate commerce in the public interest for more than fifty years as one continuous line." Further they say that the effect of the authority granted by the commission to the Southern Pacific Company is "to create and hold under its control a vast transcontinental one line transportation system with its rails

extending from the West coast via El Paso to Memphis and St. Louis and other Mississippi gateways," and that it "is designed to and will exclude or eliminate to a substantial extent Texas & Pacific lines and Missouri Pacific lines from participating in the haul via El Paso of interstate traffic originated or controlled by Southern Pacific Company, with irrevocable injury to plaintiffs' lines of railroad and to the public interest therein contrary to the intent of Congress and to the Interstate Commerce Act." As put the arbitrariness complained of consisted in a refusal to consider that portion of plaintiffs' route made up of the Southern Pacific and Texas & Pacific via El Paso. It is somewhat ambiguous as to just what is meant by the claim that the commission refused to consider this portion thereof. It cannot be said that it refused to consider its existence, or how it came about, or how long it had existed, or how it was operated or how much traffic it handled. The meaning may be that it refused to consider the effect which the purchase by the Southern Pacific of a controlling interest in the Cotton Belt and consequent legal unification of the two would have on such traffic or how the public interest would be affected by the effect which it would have thereon. Their claim is, as above indicated, that it "will exclude or eliminate to a substantial extent" the Texas & Pacific and Missouri Pacific from "participating" in "the interstate traffic originated or controlled by the Southern Pacific" and irrevocably injure them and the public. This, they claim, will be brought about by the Southern Pacific's solicitation of the shippers of such traffic with whom it comes in direct contact and manipulation of its schedules, which the acquisition of such control will motivate it to bring about. Such will be the case, notwithstanding their route has the advantage of being shorter by 266 miles, and by abrogating the agreement as to schedules heretofore referred to, they will be in position to make the most of it. Seemingly, they think and hold that the practical unification between the Southern Pacific and the Cotton Belt, which had existed for seventeen years, and the spur to the Southern Pacific of the loss of traffic by the opening of the Panama Canal, to make it up through such unification, had no serious effect upon their sharing in such traffic and that in some way a legal unification will. In combatting the position that the principal benefits which the commission found would result from the legal unification in the other field of transportation, as a

justification for its action, they contend that it is unnecessary for the reason that such benefits already exist because of the practical unification. It is, therefore, open to say that the claim of plaintiffs that the legal unification authorized "will exclude or eliminate to a substantial extent" plaintiffs from participating in such traffic is not warranted. But it cannot be said that the commission refused to consider the effect of granting the application upon plaintiffs' participation therein or how the public interest would be affected thereby. It found expressly that the granting thereof would be in the public interest. It does not follow that because the only benefits to the public arising therefrom which it specified were in the other field of transportation, i. e. between the Rio Grande Valley and the Mississippi gateways, which it said were the "principal benefit," so arising that the commission thought that the public would not be benefited in the field between the Pacific States and those gateways. It was not necessary that it should so think. That the public would be benefited in the former field was sufficient justification of itself for its action if there would be no harmful effect in the latter or, it may be said, even if the beneficial effect in the one would overbalance the harmful effect in the other. It is not questioned by plaintiffs that the public in the former field would be benefited as found by the commission or the substantiality of such benefits. It is clear that it would and that it would may have been a motive for the bringing of this suit so far as the Missouri Pacific was concerned.

However, the commission did not ignore the effect which the legal unification sought would have upon plaintiffs' sharing in the traffic originating on the Southern Pacific's lines west of El Paso, and how the public interest would be affected thereby. It considered these matters as its report shows. In the course of its opinion it said: "During the early stages of this proceeding the applicant declined to give any assurance of retention of existing routes and gateways. Toward the close of the hearing a definite statement was made on rebuttal that the El Paso gateway would remain open. On argument counsel for the applicant stated that in the event of favorable action herein no opposition would be offered to a condition requiring maintenance of existing routes. Such condition will be imposed." Immediately following this, under the heading of "Public Interest," it said: "So far as the Missouri Pacific and the Texas & Pacific are concerned

the continuance of the El Paso gateway insures adequate protection of their participation in the movement of transcontinental traffic." Then the first of three conditions imposed to the granting of the application was in these words: "That the applicant shall maintain and keep open all routes and channels of trade via existing gateways unless and until otherwise authorized by us." It expressly found that the conditions imposed were "just and reasonable." Seemingly the danger apprehended was that the Southern Pacific might break away from the Texas & Pacific and Missouri Pacific. To meet this the condition above quoted was imposed. Seemingly there was no apprehension of serious harm to plaintiffs or to the public by granting the application.

We would be justified, therefore, in view of these considerations and plaintiffs' presentation and elaboration of this ground, in thinking that really their position is not that the commission ignored and arbitrarily refused to consider the effect of the legal unification sought on their sharing in such traffic and how the public interest would be affected thereby, but that what it ignored and so refused to consider was that the Texas & Pacific under and by virtue of the Gould-Huntington agreement and the decrees of the territorial courts entered pursuant thereto had the legal right to have the Southern Pacific refrain from adopting measures to prevent the Texas & Pacific sharing in such traffic to the extent that it would in the absence of such measures and annex as a condition to granting the application that it should so refrain. The plaintiffs urged this position before the commission. In its report the commission said: "On behalf of the Texas & Pacific it is contended * * * that such acquisition of control would adversely affect the status of the Southern Pacific and the Texas & Pacific under the so called Gould-Huntington agreement." And again: "Both the Texas & Pacific and the Missouri Pacific insist that the acquisition by the Southern Pacific of control of the Cotton-Belt would constitute a violation of the Gould-Huntington agreement; that that agreement does not in any way conflict with the provisions of the interstate commerce act, but on the contrary is in the public interest; and that we should take no action which will affect adversely the long existing status of the Texas & Pacific as a continuation of the Southern Pacific lines." The response of the commission to this position was in these words: "Any order that we may issue in this

proceeding authorizing the acquisition of control as sought must be based upon a finding that such acquisition of control is in the public interest. It is not within our province to construe the Gould-Huntington agreement or adjudicate the rights of the parties thereunder. The point here at issue is not whether the Gould-Huntington agreement is in the public interest, but whether the acquisition of control as sought is in the public interest. The determination of the status of the parties under that agreement rests with the courts."

It is, therefore, true to say that the commission did refuse to consider what rights the Texas & Pacific had under this agreement and the court decrees entered pursuant thereto; and if it was its duty to consider them its refusal to do so may be said to have been arbitrary. Such we take to be the gravamen of this first ground.

It is questionable whether the Texas & Pacific under such agreement and court decrees has the right to have the Southern Pacific refrain from attempting in the way above indicated to divert east-bound traffic originating on its road west of El Paso which without such attempt would go by the Texas & Pacific and Missouri Pacific route, from such route to the Texas & New Orleans and the Cotton Belt route. By the agreement it was provided "that each of said railroads shall be operated and used by the said companies respectively, their successors and assigns, in perpetuity, for all purposes of communication, travel and transportation so far as the public and government are concerned as one continuous line." The question to which this provision gives rise is what the operation and use of the two railroads "as one continuous line" involves. Does it involve any more than that the rails of the two railroads should be connected and so kept, that there should be free interchange of traffic between them, and that through trains and joint rates for transportation over the joint route should be maintained? Or does it mean also that neither railroad company was to do anything to divert traffic originating on its line from the railroad of the other? In determining this question possibly two matters should be taken into consideration. One is that there was a provision in the agreement that the Southern Pacific should "carry all through business for the Texas & Pacific on as favorable terms as it carried with the Galveston, Harrisburg & San Antonio Railway Company." This provision was directed against discrimination on the part of the Southern

Pacific between the Texas & Pacific and the Galveston, Harrisburg & San Antonio in the matter of traffic furnished it by them. There was no provision against discrimination by the Southern Pacific between the two railroads in the matter of traffic furnished by it which would affect the railroad connection which it would take. Possibly at that time there was no room for discrimination which could and would affect the choice between them of such traffic. The other matter is that the verbiage of the provision as to the maintenance of one continuous line is the same as and seems to have been taken from the Railroad Acts, 12 Stat. 489, 495, July 1, 1862, chap. 120, § 12. Those acts contained an additional provision to the effect that facilities as to rates, time, and transportation should be without discrimination of any kind in favor of either of the others. By the later Act of June 20, 1874, c. 331, 18 Stat. 111 (45 USCA § 83), it was made an offense for any officer or agent of those companies to refuse to afford and secure to each of said roads equal advantages and facilities as to rates, time, and transportation without any discrimination of any kind in favor of or adverse to any or either of the companies. United States v. Union Pacific R. Co., 226 U. S. 61, 33 S. Ct. 53, 57 L. Ed. 124. The Gould-Huntington agreement contained no such provision.

The plaintiffs base their contention that the commission should have determined what rights the Texas & Pacific had in this particular under this agreement and the effect thereof on the matter before them on these decisions of the Supreme Court of the United States: Texas & Pacific R. Co. v. Interstate Commerce Comm., 162 U. S. 197, 16 S. Ct. 666, 40 L. Ed. 940; Kansas City So. R. Co. v. Interstate Commerce Comm., 252 U. S. 178, 40 S. Ct. 187, 64 L. Ed. 517; Baltimore & O. R. Co. v. United States, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667; St. Louis & O'Fallon R. Co. v. United States, 279 U. S. 489, 49 S. Ct. 384, 387, 73 L. Ed. 798. In the Texas & Pacific R. Co. Case the commission determined that the part of a joint rate on imported traffic received for rail transportation from port of entry to the point of destination being less than the rate on domestic traffic between those points was an unjust discrimination. In so doing it refused to consider the effect of ocean competition on the question. The statute required it to consider whether the circumstances and conditions of the two rates were substantially similar. It refused to consider such effect

because it did not think that ocean competition was a circumstance or condition within the meaning of the statute. The Supreme Court held otherwise and set aside the order complained of. The commission had refused to do that which the statute required it to do. In the Kansas City So. R. Co. Case the commission in acting under the Valuation Act of March 1, 1913 (49 USCA § 19a), had refused to consider evidence as to the present cost of condemnation and damages or of purchase of the land, rights of way, and terminals of that railway company in excess of their original cost or present value apart from improvements, which the statute required it to consider. This it did on the ground that it was impossible or difficult to perform that duty. The Supreme Court held that its valuation should be set aside. In the St. Louis & O'Fallon R. Co. Case the commission, in determining the value of the property of that company for the purpose of recapture of excess income under section 15a of the Interstate Commerce Act (49 USCA § 15a) refused to consider the present cost of construction or reproduction. The statute required the commission to give consideration to all the elements of value recognized by the law of the land. The Supreme Court held that such present cost was an element of valuation so recognized and set aside the valuation of the commission because of its refusal to consider it. The court said: "This is an express command; and the carrier has clear right to demand compliance therewith." In each of these three cases the commission had refused to perform a duty expressly imposed on it by the statute. Here it is not open to say that the commission in refusing to consider what rights the Texas & Pacific had under the agreement and those court decrees refused to perform any duty prescribed by statute. What it did was to refuse to consider the private rights of that company thereunder. The sole question which the statute referred to the commission in disposing of such an application as was before it was whether the granting of it was in the public interest. Possibly it may be said that the public has an interest in a party standing up to his contract and obeying a court decree. But it is not such public interest that the statute had in mind.

In the Baltimore & Ohio R. Co. Case no refusal to consider on the part of the commission was involved. The Supreme Court did not hold that its action should be set aside because thereof. It so held on the ground that there was no evidence justifying

its action. The order challenged was one permitting the New York Central Railway Company to require the capital stock of the Chicago River & Indiana Railroad Company, a terminal railroad within the Chicago switching district, and the Chicago Junction Railway Company, another such terminal, to lease its railroad to the Chicago & Indiana Railroad Company. The bill attacking the order charged in clear and definite terms that the finding of the commission that the acquisition and control of such companies would be in the public interest was wholly unsupported by evidence and hence was arbitrary. This fact was admitted by the motion to dismiss the bill on which the case came up for consideration. It is obvious, therefore, that this decision has no pertinency here.

This consideration given to the decisions of the Supreme Court relied on by plaintiffs makes clear that they do not support their position to any extent. On the other hand, there is a line of recent decisions thereof which make it clear that the commission has nothing to do with private rights. They are those in the following cases: Cleveland, C., C. & St. L. R. Co. v. United States, 275 U. S. 404, 48 S. Ct. 189, 193, 72 L. Ed. 338; Pittsburgh & West Va. R. Co. v. United States, 281 U. S. 479, 50 S. Ct. 378, 74 L. Ed. 980; Claiborne-Annapolis Ferry Co. v. United States, 285 U. S. 382, 52 S. Ct. 440, 443, 76 L. Ed. 808. In the Cleveland, C., C. & St. L. R. Co. Case an order of the commission requiring the plaintiff to make a switch connection with a side track of a coal company under paragraph 9 of section 1 of the Interstate Commerce Act (49 USCA § 1(9) was attacked by it. It urged against the order that the coal company had no power to construct the side track. It was held that the commission had no power to consider this question. The court said: "Congress obviously did not impose upon the Interstate Commerce Commission the duty of determining, before issuing an order, whether or not a private track actually in existence had been constructed by the shipper ultra vires. Whether in so acting the shipper transgressed powers conferred upon it by the state is a question which cannot be raised in this suit. If the state concludes to question the legality of the shipper's acts, it must do so in a direct proceeding instituted by it for that purpose." In the Pittsburgh & West Virginia R. Co. Case, an order made by the commission on application of a railroad company to abandon its station in Cleveland, Ohio, and use instead the facilities of a union terminal, under power granted it by the commission, was attacked by a minority stockholder on the ground that the directors who made the application were illegally elected, had been faithless to their trust and had not first obtained the consent of the stockholders, and hence legally had no authority to make the application or carry out the order. It was held that such was not a proper ground for attacking the order. In the Claiborne-Annapolis Ferry Company Case an order of the commission granting to a railroad company a certificate of public necessity and convenience to operate a ferry was attacked by an existing ferry company. One of the grounds of attack was that the railroad company did not have corporate power to operate the ferry. It was held that the order was not subject to attack on this ground. The court said: "Whether the railway company has corporate power to operate the proposed ferry is a question which cannot be considered in this proceeding. We think Congress never intended to impose upon the Interstate Commerce Commission the duty of determining matters of this nature before granting or withholding assent to the construction of an extension." In accordance with these decisions is that in New York Central Securities Corp. v. United States (D. C.) 54 F.(2d) 122, 130. There the commission had made an order authorizing the railroad company to acquire control of another railroad company by leasing. This order was attacked on the ground that the latter company had no power to make the lease. The court said: "The attack based upon the state law limitation of the corporate power has no proper place in a suit to annul the order." This decision was affirmed by the Supreme Court, New York Central Securities Corp. v. United States, 287 U. S. 12, 53 S. Ct. 45, 77 L. Ed. 138. These cases establish not only that the Interstate Commerce Commission, in determining whether it will exercise a power conferred or perform a duty imposed upon it, has no power to take into consideration collateral matters, such as private rights, but also that the courts in an attack made upon its order have no power to consider same. The sole question is whether the commission was empowered or required to make the order and had considered the conditions upon which it was empowered and required to make it and determined that they existed. Indeed, the matter can be pushed further. Even if it were conceded that the Texas & Pacific had rights under the Gould-Huntington agreement which the acquisition of control of the Cot-

457

ton Belt by the Southern Pacific might result in the violation thereof, the commission had power to make the orders complained of upon its determination that the public interest called for such acquisition. Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Kansas City So. R. Co. v. United States, 231 U. S. 423, 34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1; New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385.

Our conclusion, therefore, is that this ground of attack is not well taken.

2. The second ground assumes that the orders complained of rest upon a finding that the particular in which unification will be in the public interest is that it will insure a strong competitor with the Missouri Pacific for the movement of the north and south traffic from and to the Rio Grande Valley. The ground is twofold. It is that such finding is contradicted by the recorded admissions of the Southern Pacific official witnesses. It is not that the finding is not supported by any evidence, merely that it is so contradicted. The other part of the ground is that the Southern Pacific does not participate in such movement. The assumption made is not correct. The public benefit was not limited to the north and south field of transportation. The finding was that the principal benefit was to be found there. This implies that the public would be benefited also in the other or east and west field, at least in connection with this general finding that the unification sought was in the public interest. But, as heretofore said, it was not essential that any public benefit should arise from the unification in that field. The benefit arising in the north and south field was sufficient in itself to justify the unification, at least unless such benefit was overbalanced by the harm done to the public in the other field. Nor was the benefit to the public in that field confined to insuring a strong competitor to the Missouri Pacific for the traffic moving from and to the Rio Grande Valley. The finding was that the public would be benefited also in the other three particulars heretofore set forth. The contradiction relied on is rather a strange one. It is not that the public will not be so benefited. It is not questioned—it is conceded—that it will be so benefited. The contradiction is with the Southern Pacific's claim and the commission's finding that the legal unification sought will confer such benefits. It will not do so because, according to the admissions referred to, the public

was already in receipt of such benefits through the practical unification which had been in existence for seventeen years. The point comes to this, that there should be no legal unification because of such practical unification. But the fact that such practical unification has proven beneficial in this field is reason for its being made legal, rather than otherwise. It thereby insures the permanent continuance of such benefits, and the lessening of the expenses of such operation.

The position that the Southern Pacific had no right to make the application because it did not participate in the traffic from and to the Rio Grande Valley has in view the fact that it did not actually operate the railroad connecting the Cotton Belt with that valley. It was so operated by the Texas & New Orleans. We fail to see any good reason in this why the Southern Pacific should not make the application. The Texas & New Orleans was to all intents and purposes the Southern Pacific. Through the Texas & New Orleans the Southern Pacific had in reality extended itself to the Cotton Belt, and by the acquisition of a controlling interest in the capital stock of the Cotton Belt it would further extend itself to Memphis and St. Louis. Thereby it would bring the Cotton Belt, as well as the Texas & New Orleans, into its system.

3. The third ground is also founded on an assumption. The assumption is that the commission was influenced in its reports and orders were brought about by unwarranted representations made in the course of the proceedings that the Cotton Belt was in financial peril and a receivership would result if the authority sought by the Southern Pacific were denied. The representations relied on came about in this way: The examiner, to whom the application had been referred, reported against it. He said that "the record is singularly weak from the standpoint of a showing of public interest"; that "it is apparent that no specific benefit to the public can be shown"; and that "the plan may work to the distinct detriment of the public is feared by the intervenors." This they say put the applicant in a state of panic. Something desperate had to be done to meet the situation. It was met by the Cotton Belt filing exceptions to the report and in those exceptions making the representations relied on. They were that the Cotton Belt was "in desperate plight"; that it was "doomed and that quickly"; and that "unless the Cotton Belt is consolidated with the Southern Pacific lines it must be treated in the language

of Prof. Ripley as a membrium disjectum—a candidate for the junk pile." These representations were effective. If it had not been for them the report of the examiner would have been confirmed and the application denied. The ground for granting plaintiffs the relief they seek founded on this assumption is manifold. The Cotton Belt alone had a right to make a point of this and it had not intervened. The Southern Pacific, the applicant, had not pleaded the existence of such a condition of things as a reason for granting its application. There was no substantial evidence supporting these representations. They were unwarranted. And no opportunity was afforded plaintiffs to show that such a condition of things did not exist. Possibly this ground presents a case of arbitrariness. The decision in Interstate Commerce Commission v. L. & N. R. Co. and United States v. Abilene & Southern R. Co., supra, are thought to be pertinent here.

The assumption on which this contention is based is not correct. Possibly the dire representations as to the Cotton Belt's financial condition were not fully warranted. Its exact financial condition was shown by the evidence. It consisted of copies of its income account for the five calendar years preceding the application and for the months of the current years, its latest profit and loss account, and its balance sheet. In addition, its financial history from 1920 down through October, 1930, was given. According to this evidence it had maturing June 1, 1932, $20,720,750 of consolidated mortgage 4 per cent. bonds and a floating debt of $9,262,478.65. Its earnings had gradually decreased until they showed a deficit of $115,390.68 for the first ten months of 1930. In the five months from April 30, 1930, to September 30, 1930, its current liabilities had increased from $6,476,010.90 to the above-stated sum. In the same period its demand loans and bills payable had increased from two and a half million to six million dollars. Such was its financial condition in a time of great financial depression. It was such as to possibly warrant a claim that it was in financial peril and that a receivership was ahead of it unless it could get financial assistance from some quarter. We do not understand plaintiffs to contend otherwise. What they contend was unwarranted in the representations was that the Cotton Belt was dependent on the Southern Pacific for such assistance. It had other resources, the nature of which they set forth in connection with their fourth ground yet to be

considered, when reference will be made to them. Taking such to be their contention it is not true to say that, if it had not been for this harangue, the examiner's report would have been approved and the application denied. On the other hand, it is open to say that the commission was to no extent affected thereby. There is an entire absence of anything to justify such contention. What is relied on by plaintiffs as justifying this is a colloquy in the course of the hearing between one of the majority commissioners and a representative of the applicant and certain statements in the opinions of the dissenting commissioners. In the course of that colloquy the question was put by the commissioner to such representative: "Is there only one reason left, isn't there, and that is the salvation of the Cotton Belt from a public standpoint?" To which he responded: "No, indeed." The question was repeated: "Then the only public reason why we should give you the Cotton Belt would be the salvation alone of the Cotton Belt?" The response to which was, "No," followed by the commissioner's query, "Isn't that all that is left?" One of the dissenting commissioners said: "The most persuasive argument in favor of such a unification is that it will afford a haven of refuge for the Cotton Belt in a time of imminent financial peril." The other said: "The need for adding strength to the Cotton Belt is given as another reason for approving this acquisition. It is probably true that at the present time the Cotton Belt needs help but a study of its income account, which appears in this record, is quite persuasive that the present condition of the Cotton Belt is due to a considerable extent to matters within its own control or that of the applicant." These items do not justify the plaintiffs' assumption. The ground of the commission's action is fully set forth in its report. It made no statement therein as to the Cotton Belt being in need of the Southern Pacific's assistance to rescue it from such financial peril as it may have been in. It expressly based its action on its general finding that it was in the public interest that the application be granted, which finding it stated was made in the light of and upon the facts presented in its report. It specified therein the principal benefit arising therefrom, heretofore referred to. No mention was there made of the fact that the Cotton Belt was in financial peril or that it was dependent on the Southern Pacific to be rescued therefrom. Beyond question it was a feature of the case that the Cotton Belt was in need of financial assistance

and that the Southern Pacific was in position to render it. This feature must have been considered by the commission in determining what action it would take. The rendering of such assistance would insure the public benefit which it specified would arise from the unification sought.

In so far as the Cotton Belt's need of financial assistance was an element of the case and proper to be considered it was not essential for the Cotton Belt to bring it forward. The Southern Pacific had the right to present it and certain general statements in its application were sufficient to cover it. The plaintiffs quote the order of the commission governing an application like the one involved here. It is in these words: "The section and paragraph of the act under which the application is made and the nature of the application, that is whether the proposed acquisition of control is to be by lease, purchase of stock or otherwise and briefly the reasons which the applicant has to show that such acquisition will be in the public's interest (full details and particulars to be reserved for the hearing)." The Southern Pacific's application measured up to this order in this particular. It alleged that granting the relief sought would "open the way for clearer co-operation between the two systems and the better enable them to meet economically the convenience of the public," that it would result in "a relative intensity of usefulness of the carriers involved," and that thereby "competition will be preserved" and "long established routes and channels of trade and commerce would be maintained." These allegations necessarily covered that the Cotton Belt would be financially strengthened by the unification sought. It may be that there was no substantial evidence that the needed financial assistance could not be obtained from any other source than the Southern Pacific and an opportunity was not afforded to plaintiffs to show that there were other sources. It was unimportant that there were other sources. Even if there were, it was not improper that the Southern Pacific should furnish it. Indeed, in view of the considerations making for the unification it was the logical party to do so.

This ground of relief must, therefore, be held to be insufficient.

4. The fourth ground is substantially the same as the preceding one. After the making of the commission's order of January 12, 1932, the plaintiffs, on February 5, 1932, filed a petition for reconsideration and further hearing. One of the matters as to which they sought this was as to whether the Southern Pacific was the only source to which the Cotton Belt could look for financial assistance. They set up that there were several sources other than the Southern Pacific from which it might obtain financial aid. They were a 10 per cent. reduction in wages of union employees effective February 1, 1932; the Railroad Credit Corporation organized in January, 1932, to administer in aid of carriers by railroad the emergency fund growing out of the increase in rates on commodities and classes of traffic authorized by the commission in the Fifteen Per Cent. Case (Ex parte No. 103), 178 I. C. C. 539; and the Reconstruction Finance Corporation created January 22, 1932, and endowed with $500,000,000 to provide emergency refinancing facilities to aid the railroads in meeting their obligations. Shortly after the filing of such petition the latter corporation made a loan to the Cotton Belt of $18,000,000 to enable it to care for maturing indebtedness conditioned, however, on the Southern Pacific guaranteeing its repayment, principal and interest, which it did. It was further urged that the Southern Pacific was so interested in the Cotton Belt by the ownership of 35 per cent. of its capital stock and its having obligated itself to purchase an additional 23 per cent. that it would not permit the Cotton Belt to default on its obligation and suffer the loss of its investment through a receivership. It is claimed by plaintiffs that this case comes within the principles applied in that of Atchison, T. &. S. F. R. Co. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273. There the Supreme Court held that an order of the Interstate Commerce Commission should be set aside because it denied a petition for rehearing. The proceeding before the commission involved the entire rate structure of the railroads of the United States. The original hearing had been concluded in 1928, but the order of the commission was not made until July 1, 1930, to go into effect October 1, 1930. The ground upon which a rehearing was sought was that conditions had changed since 1928 and the rate structure should be based on the then conditions of things and not on those of 1928. The Supreme Court held that the petition was more than for a rehearing. It was a supplemental petition setting up facts which if true required a change in the order. The only particular in which this case is like that is in the fact that after the granting of the application January 12, 1932, the Cotton Belt received relief from the Reconstruction Finance Corporation. But that the Cot-

ton Belt was not dependent on the Southern Pacific for the financial relief which it needed was not against the granting of the application. Though the Cotton Belt may have had other resources, the Southern Pacific was the logical party to furnish the relief. That really it was the only resource is indicated by the fact that in order to get the loan from the Reconstruction Finance Corporation the Southern Pacific had to guarantee it. The other two resources which plaintiffs naïvely suggest were available do not appeal to one as having any substance. That the Southern Pacific would come to the rescue though the application were denied favored its granting. Then, as heretofore stated, there is no room to claim that the application was granted in order to save the Cotton Belt, and that it would not have been granted had the Cotton Belt not needed salvation. Everything points the other way. It seems that whatever may have been the Cotton Belt's financial condition, the situation was such as to call for the unification.

This ground thus meets the fate of the others.

5. The final ground also has to do with the denial of the petition for rehearing. Another matter set forth therein for granting the petition was that the commission should attach certain conditions to the granting of the application other than those which it had prescribed and should make a certain finding. The refusal so to do they urge entitled them to the relief which they seek. The finding which they requested was that the Southern Pacific, Texas & Pacific, and Missouri Pacific "has functioned in interstate commerce for more than fifty years and the public interest requires that this through route and connected channel of commerce shall be maintained and free and undisturbed flow of traffic over it shall be fully protected." The commission did impliedly find, as shown by the first condition which it attached to granting the application, that the public interest did require that this route should be maintained, and kept open. The finding sought may be said to go beyond such finding, in that it was to the effect "that free and unobstructed flow over it shall be fully protected." The protection had in mind was provided by the conditions which they requested to be prescribed. They were four in number. The first was that such route "shall be operated and used in perpetuity for all the purposes of commercial travel and transportation so far as the public and government are concerned as one continuous line." This is in

substance the same as the first condition prescribed by the commission. It adopts the language of the Gould-Huntington agreement. The other three conditions assume that the provisions that this route be operated and used "as one continuous line" did not cover them. The second was that the Southern Pacific with plaintiffs should "maintain on such route as parts of one continuous line, through passenger, mail, express, freight and other train service and schedules including perishable freight service and schedules equal in every respect to those afforded to its other connections, including its own lines and the lines of its subsidiaries * * * East of El Paso," and "shall not discriminate as to time or service or otherwise against plaintiffs in favor of any other connection or in favor of its own line or lines of its subsidiaries * * * East of El Paso, including the Texas & New Orleans Railroad Company." The third was that the Southern Pacific in co-operation and connection with plaintiffs should provide "for the publication and maintenance of through rates, rulings and regulations applicable to traffic moving between all points West of El Paso and all points East thereof no higher or less favorable than contemporaneously are maintained between the same points via any other of its connections including its own line and the lines of its subsidiaries * * * East of El Paso including the Texas & New Orleans Railroad." And the fourth was that the Southern Pacific should not "directly or indirectly, itself or through its subsidiary * * * so solicit traffic as to prejudice" the Southern Pacific, Texas & Pacific, and Missouri Pacific route. Some of the terms of these three conditions are possibly covered by the first condition prescribed by the commission, but it may be conceded and the case disposed of on the idea that they go beyond it.

The statute provides that if the commission finds that it is in the public interest for one carrier to acquire control of another it may authorize it to do so "under such terms and conditions" as it shall find to be "just and reasonable." It is not that it shall grant such authority upon such terms and conditions as are just and reasonable but "as shall be found" by it to be so, though possibly the two expressions mean the same thing. The question of whether the acquisition of such control is in the public interest and what terms and conditions are just and reasonable to be attached to authorize such acquisition are both submitted to the determination of the commission, the latter as well as the

former. Its action in the latter particular as well as in the former must not be arbitrary. In the case of United States v. Chicago, M. & St. P. & P. R. Co., 282 U. S. 311, 51 S. Ct. 159, 75 L. Ed. 359, the Supreme Court held that a condition under another provision of the Transportation Act of 1920 (41 Stat. 456) authorizing the commission to impose conditions was arbitrary and invalid. This it so did on the ground that the condition did not relate to interstate commerce and hence the commission did not have power to impose it. In the case of Atlantic Coast Line R. Co. v. United States, 284 U. S. 288, 52 S. Ct. 171, 76 L. Ed. 298, the validity of a condition prescribed under the statute involved here, substantially similar, though broader than the first condition prescribed here, was held to be valid. In each of these two cases the validity of a condition prescribed was involved. In the one it was held to be invalid, and in the other the holding was that it was valid. No case has arisen, so far as we know, involving the question as to whether the refusal of the commission to attach a certain condition to granting authority to one carrier to acquire control of another was arbitrary, and hence its action in granting such authority was invalid. Possibly a refusal to attach a condition that is just and reasonable would be arbitrary, and we will so treat it. What the commission was asked to do was in substance to grant the application only on condition that the Southern Pacific should not discriminate against plaintiffs in favor of its subsidiary the Texas & New Orleans and the Cotton Belt as to east-bound traffic. It is sufficient for us to say that we are not justified in holding that its refusal so to do was unjust or unreasonable or arbitrary. We would not be justified in holding that it was unwise. Seemingly the effort in plaintiffs' part was to have the commission make good what was lacking in the Gould-Huntington agreement. The much greater length of the route by the Texas & New Orleans and Cotton Belt than of that by the Texas & Pacific and Missouri Pacific was a serious handicap to the former in the competition for east-bound traffic. Though the relations between the Southern Pacific and Texas & New Orleans, on the one hand, and the Cotton Belt, on the other, had been

friendly for seventeen years and during all that time it had been to the interest of the Southern Pacific to have traffic originating on its line take the southern and longer route, it does not appear that plaintiffs ever complained of any discrimination by the Southern Pacific in favor of that route, or that it had so discriminated, or that such discrimination, if there had been any, had seriously affected the traffic handled by plaintiffs. On the other hand, it appeared that the traffic so handled had grown, particularly after plaintiffs increased its equipment and efficiency, and this, notwithstanding the agreement between them and the Southern Pacific as to schedules heretofore referred to. Possibly it was fair to the Southern Pacific that its subsidiary should get more of the east-bound traffic than would naturally come to it and possibly as much as it could induce to go that way, and possibly this was in the public interest, or at least not against it. The mere fact that the effect of granting it was to make legal and permanent an already existing practical unification—which was its sole effect—was no reason for subjecting the Southern Pacific to restrictions that it was not subjected to under such practical unification. It must be taken that the commission fully considered the effect of granting the application upon plaintiffs' traffic and how the public interest would be affected by such effect, and that its determination at least was that to whatever extent the granting thereof affected the public interest injuriously in this field of transportation it did not affect it sufficiently to prevent the public benefit arising in the other field being such as to require that it be granted. It is not for us to say that in so determining it acted unjustly or unreasonably or arbitrarily. This ground also fails plaintiffs.

It must be held, therefore, that the two orders authorizing the acquisition of the control of the Cotton Belt by the Southern Pacific are valid. It follows that the order taking the Cotton Belt from System No. 10 Illinois Central and placing it in System No. 16 Southern Pacific was valid. There is where it belonged upon the acquisition of such control if it did not already belong there. It is not claimed otherwise.

The bill is dismissed.