Edward S. WATTS et al., Appellants,

v.

MISSOURI–KANSAS–TEXAS RAIL-ROAD COMPANY, Appellee.

No. 23608.

United States Court of Appeals Fifth Circuit.

Aug. 10, 1967.

Rehearing Denied Sept. 20, 1967.

Sidney Stahl, William Van Dercreek, Ray Besing, Geary, Brice & Lewis, Dallas, Tex., for appellants.

Monroe E. Clinton, John B. Webster, Dallas, Tex., Harry G. Silleck, Jr., Thomas W. Evans, New York City, for appellee, Nixon, Mudge, Rose, Guthrie & Alexander, New York City, of counsel.

Before GEWIN, COLEMAN, GOLD-BERG, Circuit Judges.

GOLDBERG, Circuit Judge.

This is a class action brought by eight individuals and a corporation[1] (the Holders), who hold 5½% subordinated income debentures due January 1, 2033, on behalf of all other holders, against the Missouri-Kansas-Texas Railroad (Katy).[2] The Debenture is an unconditional promise to pay 5½% interest out of income as defined in Article 2 of the Indenture, dated January 1, 1958, made and entered into between the Katy and the New York Trust Company (now the Chemical Bank New York Trust

---

1. Seven of the individuals and the corporation are citizens of Washington. The eighth is a citizen of West Virginia.

2. The Missouri-Kansas-Texas Railroad is incorporated in Missouri, with its principal place of business in Texas. The railroad is popularly known, and is referred to here, as the Katy, from the quasi-acronymic use of the first two letters of the last two words in its name: _K_ansas-_T_exas.

Company) as trustee.[3] The Holders allege that the value of the outstanding debentures is $58,000,000, and that the Katy owes approximately $8,000,000 in current and accumulated unpaid interest. The Holders allege further that the Katy has realized certain gains, including gain from the sale of land ($5,634,389), from income tax refunds ($2,229,858), and from cancellation of indebtedness by the Katy's acquisition of its own debentures at less than their face value ($14,704,-990), which sums should have been credited as "available income" (a term of art defined in the Indenture; see footnote 2, supra), and used to pay the interest obligation owing on the Debentures.

The Katy's answer interposed two defenses relevant here: first, that the Holders' pleadings had failed to meet certain conditions precedent for maintaining the suit (see footnote 4, infra), and second, that the Interstate Commerce Commission, and not the district court, had primary jurisdiction of this action.

The district court granted the Katy's motion for judgment on the pleadings (F.R.Civ.P. 12(c)), and it dismissed the cause, without stating its reasons. The Holders appeal. We reverse the district court and hold that the suit may now be maintained, and that jurisdiction over it should be retained by the district court while the questions in the case which concern the Katy's accounting practices are referred to the Interstate Commerce Commission under the primary jurisdiction doctrine.

I. Standing to sue. The Katy argues that the Holders, in order to bring this action, must satisfy Section 6.06 of the Indenture,[4] which requires notice to the

---

3. Article 2 reads in part:

"Section 2.01. So long as there are any Outstanding Debentures, Available Income of the Company shall be determined for each calendar year, beginning with the calendar year 1958, not later than March 20 of the following year.

All computations of Available Income shall be on a calendar year basis and all such computations, together with all computations in respect of other accounting terms used herein, shall (to the extent not otherwise expressly provided herein) be made in accordance with accounting performed pursuant to the Accounting Classfications of the Interstate Commerce Commission or other Federal authority having similar jurisdiction in the premises at the time in force, or, to the extent not so governed, in accordance with generally accepted principles of accounting: provided, however, that accruals for income taxes shall always be deducted before arriving at Income Available for Fixed Charges whether or not such Accounting Classifications so provide. For the purposes of this Article Two, 'wholly owned subsidiaries' shall mean corporations engaged primarily in transportation, all of the voting stock of which, except directors' qualifying shares, is owned directly or indirectly by the Company during the entire year in question."

4. "Section 6.06. No holder of any Debenture or coupon issued hereunder shall have any right by virtue or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law for the enforcement of this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless (1) such holder previously shall have given to the Trustee written notice of default and of the continuance thereof, and (2) the holders of not less than 25% in aggregate principal amount of the Outstanding Debentures shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name, and shall have offered to the Trustee reasonable indemnity or security against the costs, expenses and liabilities to be incurred therein or thereby, and (3) the Trustee after receipt of such notice, request and offer of indemnity shall have unreasonably neglected or refused to institute any such action, suit or proceeding, and (4) no directions inconsistent with such written request shall have been given the Trustee pursuant to Section 6.09 of this Article Six; it being understood and intended, and being expressly covenanted by the taker and holder of every Debenture issued hereunder with every other taker and holder and the Trustee, that no one or more holders of Debentures or coupons shall have any right in any manner whatever by virtue or by availing of any provisions of this Indenture to affect, disturb or prejudice the rights of the holders of any other of such Debentures or coupons or to obtain or seek to obtain priority

trustee, demand upon the trustee to sue by bondholders who hold 25 per cent of the aggregate principal amount of the outstanding bonds, and refusal to sue by the trustee, before the bondholders themselves can sue. With these conditions the Holders have not complied.

The Holders rely on Section 6.07 of the Indenture.[5] They argue that Section 6.07 is an exception to Section 6.06, and permits suits by individual bondholders on the "unconditional and absolute" obligation to pay principal and interest, as they become due.

■ We agree with the Holders. The result is compelled by the wording and construction of the Indenture, especially in the light of the long history of cases which reach the same result.

It is common for indentures to restrict suit by bondholders unless conditions similar to those in Section 6.06 are met.

These restrictions are justified where they prevent rash, precipitate, or harassing suits by bondholders who disrupt corporate affairs by seeking to reach and deal with the security underlying the bond obligations.

No such justification exists where a bondholder seeks merely to collect the interest or principal due and owing him under the bond. Courts have recognized this distinction and have limited "no-action clauses" as the provisions setting forth the restrictions on suit are often called) so that they do not restrict suits by individual bondholders for interest or principal due and owing. In Noble v. European Mortgage and Investment Corp., 1933, 19 Del.Ch. 216, 165 A. 157, the Court had before it provisions virtually identical to those in this case.[6] The opinion states in part:

"So far as the literal language of the instrument goes, the compulsion upon

over or preference to any other such holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all holders of oustanding Debentures and coupons. For the protection and enforcement of the provisions of this Section 6.06 each and every Debenture holder and the Trustee shall be entitled to such relief as can be given either at law or in equity."

5. "Section 6.07. Nothing contained in this Indenture or in the Debentures shall affect or impair the obligation of the Company, which is unconditional and absolute, to pay the principal of and interest on the Debentures as therein promised, or shall affect or impair the right of any holder of a Debenture to receive payment of the principal of and interest on such Debenture on or after the respective due dates thereof, or to institute suit for the enforcement of such payment on or after such respective dates."

6. The relevant provisions in Noble are as follows: "No holder of any bond or coupon issued hereunder shall have any right to institute any action or proceeding at law or in equity upon or in respect of this indenture, or for the execution of any trust or power hereof, or for any other remedy under or upon this indenture, without having given to the Trustee written notice of a default hereunder and of its continuance as herein-

above provided, nor unless also the holders of twenty-five per cent (25%) in amount of the bonds then outstanding hereunder, shall have made written request of the Trustee to act hereunder and have afforded it reasonable opportunity so to act, nor unless also they shall have offered security satisfactory to the Trustee against all costs, expenses and liabilities. Such notification, request and offer of indemnity are declared to be conditions precedent in every case to the obligation of the Trustee to take any action on account of any default under this indenture, and to any action or cause of action by any holder under said bonds and coupons and this indenture, it being understood that no one or more holders of bonds and coupons shall by his or their action disturb the lien of this indenture, or enforce any right hereunder, and that all proceedings at law or in equity shall, subject to the provisions of Section 2 of Article IV hereof and of Section 1 of this Article VI, be had for the equal benefit of all holders of outstanding bonds and coupons.

"Nothing in this Section or elsewhere in this indenture or in the bonds or in the coupons attached thereto shall affect or impair the obligation of the Company, which is unconditional and absolute, to pay the principal and interest of the bonds to the respective holders of the bonds and to the respective holders of

the bondholders to act first through the trustee is confined only to remedies 'under or upon this indenture.' The complainants are not seeking to pursue any rights under the indenture. The last paragraph of the quoted excerpt is quite clear in reserving to the bondholders complete liberty of action to enforce all payments due them whether for principal or coupons so long as the procedure they adopt is not under the indenture. Restrictions of the character found in this indenture are not to be extended by implication. They are effective only so far as they are clear and reasonably free from doubt. * * * Being restrictive of the common law rights of creditors, they are to be strictly construed. * * * The complainants hold interest coupons which are in default. Under the terms of the indenture itself they can assert with respect to such coupons the right of payment and can bring an action to enforce the same. The complainants are creditors, therefore, who possess a right to enforce immediate payment of coupons overdue without recourse to the trustee. * * * This gives them a status entirely unaffected by any supposed limitations which the indenture might be thought to impose upon their right to seek to enforce payment of the principal of the bonds." 19 Del. Ch. at 221, 165 A. at 159.

Halle v. Van Sweringen Corp., 1936, 7 W.W.Harr. 491, 37 Del. 491, 185 A. 236. See Putnam v. Pittsburgh R. Co., 1938, 330 Pa. 210, 199 A. 211; Japha v. Delaware Valley Utilities Co., 1940, 1 Terry 599, 40 Del. 599, 15 A.2d 432.

Birn v. Childs Co., Sup.Ct.1942, 37 N.Y.S.2d 689, was a suit to enforce a covenant in the indenture which required the corporation to pay certain sums into a sinking fund. The New York Supreme Court distinguished that case from cases like the present: "This suit is one for the enforcement of a covenant of the indenture, the sinking fund provision, and is not one to enforce payment of the debentures or their coupons, and it thus falls within the scope of [the section of the indenture with requirements similar to those of Section 6.06 here]." · 37 N.Y.S. 2d at 696.[7] See Betts v. Massachusetts Cities Realty Co., 1939, 304 Mass. 117, 23 N.E.2d 152.

Another major reason for limitation and strict construction of no-action clauses has been the desire to keep the bond, or debenture, negotiable. This aspect of the problem is discussed in Mendelson v. Realty Mortgage Corp., 1932, 257 Mich. 442, 445, 241 N.W. 154, 155:

"The rule invoked by defendant has its limitations, 3 R.C.L. 871, which need not be discussed because it is a fact, recognized alike by business and the law, that a bond and its securing mortgage have different functions, are governed by different legal principles, and, for some purposes at least, are separate contracts. * * * If it were not so, there would be no negotiable bonds except by accident, because provisions found in practically all trust mortgages would destroy negotiability. * * * Primarily, a bond is a contract to pay; the mortgage is a separate contract to secure payment. The provisions of the mortgage are incor-

---

the coupons attached thereto, at the respective due dates in such bonds and coupons stated, nor affect or impair the right of action, whch is also absolute and unconditional, of such holders to enforce such payment." 19 Del.Ch. at 219, 165 A. at 158.

7. The court had this to say about the validity of no-action clauses:
"Restrictive or no-action clauses have been inserted in corporate mortgages and trust indentures for years. In so far as they prevent individual holders from

getting special advantages for themselves and protect the rights and security of all holders as a class, and also in so far as they afford the trustee notice and an opportunity for examination, they serve a highly useful purpose and have been uniformly sustained, even though sometimes said to be not favored and to be strictly construed, but no case has been cited or found which holds that such a clause prevents such a suit as is here brought under such circumstances as are here disclosed."
37 N.Y.S.2d at 696.

porated into the bond only in so far as, by proper language, they are made part of the bond and the holder thereby is given notice of them. \* \* \* The incident of negotiability in bonds necessary to enable the business of the country to be transacted and the protection of the bondholder from conditions in a mortgage which he ordinarily does not see, and which are not set out in the bond which he does see, have properly inclined the courts to a struct construction of language which attempts to modify the obligation of and rights under a bond by incorporation in it, through reference, of provisions of the mortgage."

The New York cases have taken this line. Cunningham v. Pressed Steel Car Co., 1933, 238 App.Div. 624, 265 N.Y.S. 256, aff'd per curiam, 1934, 263 N.Y. 671, 189 N.E. 750; Medwin v. 11 West Forty-Second Street, Inc., 1941, 261 App.Div. 721, 27 N.Y.S.2d 551; Lubin v. Pressed Steel Car Co., N.Y.City Ct.1933, 146 Misc. 462, 263 N.Y.S. 433. In Guardian Depositors Corp., v. David Stott Flour Mills, Inc., 1939, 291 Mich. 180, 188, 289 N.W. 122–123, Chief Justice Butzel discusses this problem with candor:

"I cannot agree that the reference to the clause referring the bondholder to the trust mortgage in order to ascertain the terms and conditions upon which the bonds were issued and secured is obscure or indefinite. It is inconspicuous because grouped with matters not controlling the right to sue on the bond, but it distinctly refers to the trust mortgage and the 'terms and conditions on which said bonds are issued and secured.' We have consistently held that reference in the bond to the mortgage for other conditions was sufficient. \* \* \*

"It seems that similar wording in a bond that refers to a mortgage forbidding an action by an individual bondholder has been upheld by both State and Federal decisions in the numerically larger number of cases and jurisdictions where the question has arisen. On the other hand, such mere reference has been held insufficient by the court of New York and Illinois. The two viewpoints are irreconcilable as will be shown by the large number of decisions collated in 108 A.L.R. 88. The Federal courts and probably a numerical majority of the State courts also have carried the doctrine of constructive notice to the ultimate extreme in an endeavor to enforce no-action provisions in the trust instruments. Other cases indicate such reluctance to interfere with the normal right of the bondholder to bring his action that what would be sufficient incorporation by reference in all other instances has been deemed insufficient to incorporate provisions of the mortgage restraining suit on the bonds. \* \* \* Manifestly, both procedures are open to criticism. It seems, however, the more reasonable, ethical and business-like approach is to demand that the restriction upon the right to sue for payment of the note or bond on maturity should appear upon the face thereof.

"By thus requiring express notice on the bond, we preclude repeated litigation to determine whether the referential langauge in any kind of bond issue is adequate or not. We eliminate once for all the vexing problem of negotiable corporate bonds, which is not questioned in the instant case. In coming to this conclusion, we need not discuss the prohibitory language of the indenture in the instant case which is believed by some of us to be insufficient to prevent suit on the bond."

The Katy argues a constricted construction of the Debentures and Indenture in order to position the Holders in judicial immobility. It seeks to distinguish the obligation in the debenture here in question, which is to pay interest only when there is "available income", as defined in Section 2 of the Indenture (see footnote 2, supra), from cases where "a *liquidated* amount of principal or interest is due and owing" (emphasis added). The Katy argues that Section 6.07 applies only to "unconditional" obli-

gations to pay, and concludes that the duty to pay interest year-by-year is not "unconditional" under these Debentures because the obligation is contingent on there being "available income" as defined by the Indenture. The railroad's brief states "Section 6.07, relied on by [the Holders] * * *, comes into play if the fixed principal becomes due and is unpaid, or if the fixed interest for the last year of Debentures' life is due and unpaid, or perhaps if the Officers' Certificate for any year shows sufficient available income to pay interest but the same is not in fact paid on the following April 1." By this argument the unqualified terms of 6.07 are read out of it. It is made to lie fallow and jejune, with effect only in the year 2033 or "perhaps" if the officers of the company certify that there is "available income" sufficient to pay interest and then do not pay it.

This argument is, as the Holders point out, "indeed * * * a safe and comfortable position" for the Katy. But the argument is unreasonable, especially in the light of the past cases. The Katy does not sit in such a catbird seat.

The mere fact that "available income" is defined in the Indenture and not the Debentures does not mean that the right to receive interest is a right arising from the Indenture and calling for a lawsuit only under 6.06. In this situation the rights of the Holders are not subordinate to provisions in the Indenture. The suit stricture in Section 6.06 is on the enforcement of the indenture, but the promise to pay interest out of income is a Debenture obligation and not an Indenture right or duty. The right to sue for interest to the year 2033 and "perhaps" to periods when the Katy's officers felt like paying dividends, would run counter to the common law and would erode, if not destroy, the negotiability of the bonds. Strictures such as these must be viewed as strids and not chasms. The obligation to pay interest out of income is unconditioned, unstinted, and continuous; the language of Section 6.07 is too broad and general to permit the strained or naive interpretation called for by the Katy. Numerology holds no magic, but it is not merely astrological to point out that when Section 6.07, following 6.06, states: "Nothing contained in this Indenture nor the Debentures shall affect or impair the obligation of the company, which is unconditional and absolute [to pay interest and principal] * * *, or shall affect or impair the right of any holder * * * to receive payment * * * or to institute suit for the enforcement of such payment * * *," Section 6.07 does not parrot or restate 6.06, but creates a clear exception to it relating to different circumstances. A sodality among Holders is appropriate in enforcing rights in the security for the benefit of the many in order to prevent atomization and fission of the company. But such a unitary concept is not relevant to a simple suit for debt. Suit here is on the Debentures, and not the Indenture.

In addition, as discussed more fully in Part II, the securities here in question were issued pursuant to 49 U.S.C.A. § 20b, a 1948 amendment to the Interstate Commerce Act, 62 Stat. 162. The Congressional Declaration of Purpose of the Act states in part:

"[I]t is hereby declared to be in aid of the national transportation policy of the Congress, as set forth in the preamble of the Interstate Commerce Act, as amended, in order to promote the public interest in avoiding the deterioration of service and the interruption of employment which inevitably attend the threat of financial difficulties and which follow upon financial collapse and in order to promote the public interest in increased stability of values of railroad securities with resulting greater confidence therein of investors, to assure, insofar as possible, continuity of sound financial condition of common carriers subject to part I of said Act, to enhance the marketability of railroad securities impaired by large and continuing accumulations of interest on income bonds and dividends on preferred stock and to enable said common car-

riers, insofar as possible, to avoid prospective financial difficulties, inability to meet debts as they mature, and insolvency."

62 Stat. 162–163; 1948 U.S. Code Congressional Service, p. 170. The very statute which authorized these Debentures sought to enhance marketability of railroad securities. As we have discussed, courts have consistently held that the negotiability, and therefore the marketability, of securities is reduced when no-action clauses are construed to limit suits upon interest obligations. If we here held that a suit for interest due, which is the "unconditional and absolute" right of the Holders under Section 6.07, would almost invariably necessitate a suit under 6.06 merely because "available income" is defined in the Indenture, we would render 6.07 worthless. This interpretation would sap what marketability these securities have and would disdain the national policy behind them. We need not hold that a no-action clause which clearly applied would be invalid. We do hold that in order to raise the issue of the validity of 6.06 in an action for interest due and owing, that section would have to be applicable by some more obvious route than the tortuous and dimly marked path argued for here by the Katy. To reach the question of the validity of collectivization of remedies in a suit like the present, the taint must plainly appear on the debentures.

II. Primary jurisdiction. As we have held that the Holders may now sue the Katy for interest which the Holders claim is due and owing, we proceed to the question of what forum or forums the suit should continue in.

The Katy argues that the Interstate Commerce Commission should decide the issues calling for the interpretation of its Accounting Classifications, which are, as noted above, incorporated into the procedure for determining "available income." [8] (See footnote 3, supra). We agree. This action concerns more than the two parties, and "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body * * *." United States v. Western Pacific R. Co., 1956, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132. The decision of these issues by a court and jury would endanger the uniform application of the Interstate Commerce Act and would waste the opportunity to use the experience and expert knowledge of the Interstate Commerce Commission in interpreting regulations which it promulgated to serve policies which it is charged to pursue.

The Supreme Court, in Kansas City S. R. Co. v. United States, 1913, 231 U.S. 423, 34 S.Ct. 125, 58 L.Ed. 296, recognized the value of, and indeed, the necessity for, the uniform system of accounting exacted of the railroads by the Commission. In that case, the railroad had spent large sums on improving its lines by replacing certain steeply graded trackage with trackage of a gentler grade. These improvements were financed by successive bond issues as money was required. The railroad also had outstanding an issue of preferred stock, which paid dividends only out of current earnings. The railroad wished to charge the entire sum spent on the improvements to "Additions and Betterments," which was a capital account. The Commission, on the other hand, held that its accounting procedures required the railroad to deduct from the cost of improvements the estimated replacement cost of the portions of track abandoned, and to charge this replacement cost, less salvage, to the operating expenses account of that year. The railroad attacked the reasonableness of the accounting regulations, and complained that such a great current expense would cut down earnings and prohibit payment of dividends on bonds and preferred stock. Without such payments, the railroad argued, its credit would be impaired, and it would no longer be able to float the succeeding bond issues needed for further improvements.

---

8. The Katy's brief notes that it does not claim that the ICC has primary jurisdiction to enforce the contracts here in question, but merely to decide "questions involving its own [accounting] regulations."

The Supreme Court sustained the questioned accounting regulations of the Commission and emphasized the importance of their uniformity:

"The very object of a system of accounts is to display the pertinent financial operations of the company, and throw light upon its present condition. If they are to truly do this, the form must correspond with the substance. In order that accounts may be standardized, it is necessary that the accounts of the several carriers shall be arranged under like headings or titles; and it is obviously essential that charges and credits shall be allocated under the proper headings,—the same with one carrier as with another. Unless 'Additions and Betterments,' on the one hand, and 'Operating Expenses,' on the other, are to indicate the same class of entries upon the books of one carrier that they indicate upon the books of other carriers, there is no possibility of standardization. So far as such uniformity requirements control or tend to control the conduct of the carrier in its capacity as a public servant engaged in interstate commerce, they are within the authority constitutionally conferred by Congress upon the Commission. There is no direct interference with the internal affairs of the corporation; and if any such interference indirectly results, it is only such as is incidental to the lawful control of the carrier by the Federal authority, and to this the rights of stockholders and bondholders alike are necessarily subject.

\* \* \* \* \* \*

" \* \* \* [I]t will be observed that § 20, as originally enacted, authorized the Commission 'in its discretion, for the purpose of enabling it the better to carry out the purposes of this act, [to] prescribe \* \* \* a period of time within which all common carriers subject to the provisions of this act shall have, as near as may be, a uniform system of accounts, and the manner in which such accounts shall be kept.' Congress, when it enacted the Hepburn act in 1906, must have known that the Commission had not as yet found occasion to enforce this provision; and at the same time may be deemed to have contemplated that the authority then for the first time conferred upon the Commission to determine and prescribe the maximum rates to be charged by the carriers for the services to be performed by them furnished a new and more cogent reason for establishing a uniform system of accounts.

"Plainly, the lawmaking body recognized the essential distinctions between property accounts and operating accounts, between capital and earnings; it recognized that the practice of different carriers varied in respect of these matters; and that no system of supervision and regulation would be complete without requiring the accounts of all the carriers to speak a common language." 231 U.S. at 441–443, 34 S.Ct. at 130, 58 L.Ed. at 303–304.

The Court recognized that the Commission had control over the accounting structure of the railroads, and that this control was vital to proper ratemaking under the Hepburn Act.

The issuance of the Debentures here in question demonstrates the full control of the Commission over the financial structure of the railroad. On July 15, 1958, the Commission, pursuant to its authority under 49 U.S.C.A. § 20b of the Interstate Commerce Act approved the application of the Katy to "alter and modify" its seven per cent cumulative preferred stock by replacing such preferred stock with 5½ per cent 75-year income debentures upon which the interest obligation was not fixed, but was payable only out of such "available income" as the Katy had each year.[9] Missouri-Kansas-Texas

---

9. Senior to this preferred stock was $59,-112,019 of unmatured funded debt and $34,951,369 of equipment obligation. Junior to the preferred stock was 808,971 shares of no-par common with a stated value of $84.42 per share. 295 I.C.C. at 760.

Railroad Securities Modification, 1958, 295 I.C.C. 759.

The Commission found the modification under § 20b to be in the public interest, to be in the best interests of the carrier, of the holders of all classes of its stock, and of the holders of the obligations affected by the modification, and not adverse to any creditor not directly affected by the modification. These findings are required by § 20b(2) (b)–(d). Cf. Schwabacher v. United States, 1948, 334 U.S. 182, 68 S.Ct. 958, 92 L. Ed. 1305. In addition, under § 20b(5), the Commission's authority was "exclusive and plenary"; and the parties were "relieved from the operation of all restraints, limitations, and prohibitions of law, Federal, State, or Municipal, insofar as [might] * * * be necessary to enable them to make and carry into effect the alteration or modification so approved * * *." Cf. Schwabacher v. United States, supra. By § 20b(8), "the Commission may from time to time, for good cause shown, make such supplemental orders in the premises as it may deem necessary and appropriate."

The bonds approved by the Commission change the interest-paying obligation from the seven per cent cumulative requirement to a 5½ per cent figure payable only out of "available income," a term defined by reference to the Accounting Classifications of the Commission.

The Commission found that the use of the contingent interest feature was important to the financial structure and outlook of the Katy.[10] The Commission stated, 255 I.C.C. at 776:

"The public is primarily interested in the maintenance of adequate rail services and sound financial conditions of

---

10. That the interpretation of "available income" is important to obligations both senior and junior to the bonds in issue can be seen from Section 2.03 of the Indenture:

"Section 2.03. Available Income for each calendar year, computed in accordance with Sections 2.01 and 2.02 of this Article Two, shall be applied or set aside or made available on April 1 of the following year, to the extent that the same shall suffice therefor, for the following purposes and in the following order:

(1) If the Board of Directors of the Company shall so determine, to the creation of, or to the credit of, a Capital Fund to be applied to, or to provide for, or to reimburse the treasury of the Company for, payments which shall become due subsequent to January 1, 1958 on or for (A) Capital Investments included within the accounts of the Interstate Commerce Commission's Uniform System of Accounts presently entitled Road and Equipment Property, Improvements on Leased Property, and Miscellaneous Physical Property, and numbered Accounts 731, 732 and 737, or such substituted accounts as may at the time be in effect, but including in such Capital Investments initial and principal payments upon equipment leased under equipment trusts or purchased under conditional sale agreements only to the extent that such payments during any calendar year shall exceed depreciation of all equipment charged against income for such calendar year, or (B), expenditures of wholly owned subsidiaries of the Company which, if made directly by the Company for the same purposes in respect of its own properties, would be chargeable to said accounts; provided, however, that

(i) the amount set aside in the Capital Fund out of Available Income for any calendar year shall not exceed the sum of $2,000,000 or 2½% of the Railway Operating Revenues of the Company and its wholly owned subsidiaries for such calendar year, whichever is the greater, plus the amount, if any, by which Available Income applicable to such Capital Fund for the last preceding calendar year shall have been less than the maximum amount permitted for the Capital Fund for such year; and

(ii) the amount of the Capital Fund which shall be unused or unappropriated at any one time shall not exceed $4,000,000;

(2) Subject to the limitations set forth in Section 2.05 of this Article Two, any then remaining Available Income for such calendar year shall be applied, or set aside for application during the then current calendar year, to the payment into any contingent sinking fund or sinking funds, which may be either cumulative or noncumulative, of amounts provided for in re-

the carriers. Obviously, the replacement of applicant's preferred stock and the high dividend accumulation thereon with contingent interest debentures, certificates retirable only from earnings of the company, and common stock would improve its earnings before fixed and contingent charges and its credit rating, and therefore would be in the public interest."

While the doctrine of primary jurisdiction is not of antiquity, it has a respectable geneology and is almost as old as the first of the administrative agencies to which it entrusts reference. In Texas & P.R.C. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 440–441, 27 S.Ct. 350, 355, 51 L.Ed. 553, 559, Mr. Justice (later Chief Justice) White said for the Court:

"For if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject of an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission, and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed."

Explaining the history and development of the doctrine, the Court in United States v. Western P. R. Co., supra, said through Mr. Justice Harlan:

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special confidence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. * * *

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially

spect of any securities or obligations now or hereafter issued or incurred by the Company which may require such payment out of such remaining Available Income;

(3) Any then remaining Available Income for such calendar year shall be applied on such April 1 to the payment of the instalment of interest on the then outstanding Debentures payable on that date;

(4) Any then remaining Available Income for such calendar year shall be applied on such April 1 to the pay-

ment of unpaid accumulated interest, if any on the outstanding Debentures;

(5) Any then remaining Available Income for such calendar year shall be applied on such April 1 to the payment of amounts, if any, which shall then be required by the terms of the Sinking Fund provided for in Section 3.02 of Article THREE hereof; and

(6) Any then remaining Available Income for such calendar year may be applied at any time and from time to time for any proper corporate purpose of the Company.

a specialized agency passed on certain types of administrative questions. * * * More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. See Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. The two factors are part of the same principle, 'now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.' Id. 342 U.S. at pages 574, 575, 72 S.Ct. at page 494.

"The doctrine of primary jurisdiction thus does 'more than prescribe the mere procedural timetable of the lawsuit. It is a doctrine allocating the law-making power over certain aspects' of commercial relations. 'It transfers from court to agency the power to determine' some of the incidents of such relations." 352 U.S. at 63–65, 77 S.Ct. at 165, 1 L.Ed.2d at 132–133.

In Thompson v. Texas Mexican R. Co., 1946, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132, the Texas Mexican Railway had an agreement with the Brownsville Railroad permitting Brownsville to use certain Texas Mexican tracks. Either party could terminate the agreement upon twelve months' notice. Brownsville went into reorganization in 1933. In 1940 Texas Mexican gave notice of termination of the agreement, but after the 12 months had elapsed, the trustee of the Brownsville continued to use the Texas Mexican tracks, and the latter sued for an injunction. The Supreme Court held that primary jurisdiction resided in the Commission to determine the rights of the parties. The Court reasoned that the Commission controlled the reorganization under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205; and controlled questions of trackage rights and abandonment of lines under §§ 5(2) and 1(18) of the Interstate Commerce Act, 49 U.S.C.A. §§ 5(2), 1(18). The Court thus emphasized that all of the questions there in issue had been committed by statute to the Commission. Mr. Justice Douglas stated for the Court:

" * * * [I]n a long line of cases beginning with Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co. * * * [supra], it has been held that where the reasonableness or legality of the practices of the parties was subject to the administrative authority of the Interstate Commerce Commission, the court should stay its hand until the Commission had passed on the matter. * * * That course is singularly appropriate here. It is the function of the Commission to determine the terms and conditions under which trackage rights are acquired. If the parties were allowed to by-pass the Commission and litigate the question in the courts, the power to fix the rental under trackage agreements would be shifted from the Commission to the courts and juries.

* * * [I]t is one of the Commission's high functions to protect the public interest against unfair or oppressive financial practices which in the past led to such great havoc and disaster. That policy would be undermined if the carriers could repair to courts for determination of the conditions under which trackage rights could be secured. Then jury verdicts or settlements would take the place of the expert and informed judgment of

the Commission." 328 U.S. at 147–148, 66 S.Ct. at 945, 90 L.Ed. at 1141.

Professor Jaffe, in considering the question of what issues should be referred to an agency under the doctrine of primary jurisdiction, states:

"The answer, I think, should be grounded in the notion of statutory purpose. If 'expertise' be a relevant datum implied in the statutory scheme, it is yet no more relevant than the statute (and the total legal situation in which it is found) makes it. It is undoubtedly an implied aspect of the statutory purpose that a specialized administrative tribunal has been created to deal with problems in a certain area; statutes setting up agencies may be assumed to focus the solution of the problem in terms of the development of special competence. But a grant of power implies a limit, and the simultaneous grant of jurisdiction to the courts or a failure to abolish jurisdiction potentially conflicting may indicate where that limit is. The statutory purpose is seldom sufficiently explicit to resolve the conflict. It becomes necessary to construct a system not in the unmediated term of the dominance of a presumed expertness but in terms of what is necessary to make all the prescribed procedures workable. This system must perforce include concurrent judicial remedies so far as they are taken to survive."

Jaffe, Primary Jurisdiction, 77 Harvard L.Rev. 1037, 1041 (1964).

The railroad industry is integrally regulated by the Commission. The economics of railroading, especially in this era of competition from truck and airplane, is not simplistic. Its congeries have exquisitely tangled complexities. At the very least, with the aid of the Commission this problem will be deciphered consistently with all other similarly situated problems. The logoriph of the 144 pages of Accounting Procedures (see footnote 13, infra) will be uniformly solved.

We do not suggest that the necessary computations are purely esoteric or arcane to courts, but we know that the Commission has insights and experience denied judges. The subleties of railroad financing, encased in jargon and tucked into the interstices of the administrative scheme, may escape us. The answer to the question of what is income, if given by us, could destroy or impair the rate-making or capital structures of the Katy, whereas the statutory scheme comprehensively commits their superintendent to the Commission. Income relates to rates, and rates relate to competition. The capital structure was designed to add to the length and fullness of days for the Katy. Control over these matters has been ceded to the Commission, in order that an informed, uniform, consistent policy may result. The piecemeal, sporadic decisions by courts should not interfere with or bypass these statutory schemes. Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576; Thompson v. Texas Mexican R. Co., supra; Carter v. American Telephone & Telegraph Co., 5 Cir. 1966, 365 F.2d 486, cert. denied 385 U.S. 1008; Maddock & Miller, Inc. v. United States Lines, 2 Cir. 1966, 365 F.2d 98; River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir. 1958, 253 F.2d 922, remanded on other grounds, 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334. See 3 Davis, Administrative Law § 19.01 esp. at 5 (1958). Compare United States v. Radio Corp. of America, 1959, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354.[11]

11. In United States v. R.C.A., the Court held that the Federal Communications Act had not so displaced the Sherman Act that primary jurisdiction over antitrust issues had to be given the Federal Communications Commission in an antitrust action against R.C.A. The Court said in part:

"While the television industry is also a regulated industry, it is regulated in a very different way. That difference is controlling. Radio broadcasters, including television broadcasters * * * are not included in the definition of common carriers in § 3(h) of the Communications Act, 47 U.S.C. § 153(h), as are tel-

The Holders argue that they do not here attack the validity or reasonableness of the Commission's Accounting Procedures. They also argue, citing Great Northern R. Co. v. Merchants' Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943, and Louisiana & A. R. Co. v. Export Drum Co., 5 Cir. 1966, 359 F.2d 311, that the accounting regulations, principles, and practices are clear and easily comprehensible by laymen.

These related arguments are of no avail to the Holders. Attacks on the reasonableness of agency regulations are, of course, not the only justifications for exercise of primary jurisdiction. Questions of the interpretation and applicability of statutes and regulations, and other claims which require "the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body" [12] are proper subjects of primary jurisdiction. What is involved is not the narrow matter of challenges against specific regulations or practices, but the broader issue of "protection of the integrity of a regulatory scheme." Maddock & Miller, Inc. v. United States Lines, supra, 365 F.2d at 101.

In addition, the interpretation of the Accounting Procedures is not as simple a matter as Holders contend. In another part of their brief, Holders describe the trial of the lawsuit as they envision it:

"From a reading of the Complaint, it is clear that the sole ultimate issue between the parties is whether or not the Appellee wrongfully diverted income of the company to the retained income or surplus account, rather than applying such income to the 'Available Income' account. That issue will then, in turn, depend upon whether or not Appellee can justify its use of the income by recognized accounting procedures, either as published in the Accounting Classification of the I.C.C., or in accordance with generally accepted principles of accounting. The determination of the ultimate issue and the subsidiary issue mentioned is a determination of facts. *These facts will be established by evidence of the books and records of the company, and the testimony of expert accounting witnesses.*" [emphasis added.]

The issues involve not only legal interpretation, but factual issues and mixed questions of fact and law involving application of the accounting standards to the facts found). In *Great Northern,* supra, Mr. Justice Brandeis distinguished between questions answerable by courts and questions properly invoking primary jurisdiction. He said:

"When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. But words are used sometimes in a peculiar meaning. Then extrinsic evidence may be necessary to determine the meaning of words appearing in the document.

ephone and telegraph companies. Thus the extensive controls, including rate regulation, of Title II of the Communications Act, 47 U.S.C. §§ 201–222, do not apply. Television broadcasters remain free to set their own advertising rates. As this Court said in Federal Communications Com. v. Sanders Bros. Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 869.

'In contradistinction to communication by telephone and telegraph, which the Communications Act recognizes as a common carrier activity and regulates accordingly in analogy to the regulation of rail and other carriers by the Interstate Commerce Commission, the Act recognizes that broadcasters are not common carriers and are not to be dealt with as such. Thus the Act recognizes that the field of broadcasting is one of free competition. The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition as it has done in the case of railroads * * *.'

"Thus there being no pervasive regulatory scheme, and no rate structures to throw out of balance, sporadic action by federal courts can work no mischief. The justification for primary jurisdiction accordingly disappears." 358 U.S. at 348–350. 79 S.Ct. at 466, 3 L.Ed.2d at 364–365.

12. United States v. Western P. R. Co., supra, 352 U.S. at 64, 77 S.Ct. at 165, 1 L.Ed.2d at 132.

This is true where technical words or phrases not commonly understood are employed, or extrinsic evidence may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument. Where such a situation arises, and the peculiar meaning of words, or the existence of a usage, is proved by evidence, the function of construction is necessarily preceded by the determination of the matter of fact. Where the controversy over the writing arises in a case which is being tried before a jury, the decision of the question of fact is left to the jury, with instructions from the court as to how the document shall be construed if the jury finds that the alleged peculiar meaning or usage is established. But where the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the Commission; and not until this determination has been made can a court take jurisdiction of the controversy. If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not be attained. For the effect to be given the tariff might depend, not upon construction of the language,—a question of law,—but upon whether or not a particular judge or jury had found, as a fact, that the words of the document were used in the peculiar sense attributed to them, or that a particular usage existed."

259 U.S. at 291–292, 42 S.Ct. at 479, 66 L.Ed.at 946–947.

The rationale for prior referral of issues to the Commission set forth by Mr. Justice Brandeis applies here. For example, one of the items which the Holders seek to classify as "available income"

is a $5,634,389 gain on the sale of land. Account 519 [13] of the Commission accounting regulations covers sale of land. It reads in part:

"519 Miscellaneous Income.

(a) This account shall include all items, not provided for elsewhere, properly creditable to income accounts during the current year. Among the itmes which shall be included in this account are: * * *

Profit from sale of land used for transportation purposes, of noncarrier property, and of securities acquired for investment purposes. * * *

(b) When the profit from sale of land, noncarrier property, or investment securities other than temporary cash investments, or from the reacquisition of the company's own bonds, is so material in amount that its inclusion in income account would distort and impair the significance of net income for the year, such profit shall be credited to the appropriate retained income account."

The questions of materiality of income and distortion or impairment of the significance of income are mixed questions of fact and law which require the insights and experience of the Commission for a solution consonant with a unified national policy.

Our railroads have suffered fiscal fiascos and redoubtable returns to solvency under the aegis of the Commission. More particularly, the highs and lows of the Katy's history must have militated in favor of the financial schematics used here by the Commission. The reasons for that use have been accumulated over years of regulation of railroads in general and the Katy in particular. Such reasons are the essence of the specialized knowledge of the Commission, but they are only surmisable by us. "Questions which the courts call 'law' may appropriately be determined in the first in-

13. The Accounting Classifications of the Commission referred to in the Indenture appear at 49 C.F.R. Part 10, entitled Uniform System of Accounts for Railroad Companies. They comprise 144 pages.

stance by courts, because uniformity may be secured through review by a single Supreme Court, but the unifying influence of that Court can reach neither factual determination nor the exercise of specialized judgment." 3 Davis, Administrative Law § 19.02 at 8 (1958).

The invocation of primary jurisdiction turns on the facts of the individual case, as noted above. This case involves a great deal more than an attack by one shipper on the reasonableness or interpretation of the tariff for one commodity. Whatever the decision here, the questions of the case penetrate to the center of the Katy's finances. All aspects of its economy will be affected by the outcome: its ability to meet its financial obligations both senior and junior to those of the Holders, its prospects for raising more public money in the future, the base upon which all of its rates to all of its shippers are determined, and its ability to compete not only with other railroads, but with other modes of transportation. The claims pressed by the Holders are large enough to affect substantially all of the factors here mentioned. Of course the extent of the possible damage is not a reason for deciding in the Katy's favor but it is a reason for placing the decision in the hands of those charged by Congress to supervise these matters. Administrative agencies are not only adjudicators, but advisers and planners. We are neither narcissistic nor allergic to informed advice. We welcome the opportunity to gain the Commission's knowledge. The Court's ultimate decision here will be an informed and understanding one, abating or minimizing the dissonances which might otherwise tamper with national policy here sought to be vindicated.

In sum, we hold that plaintiffs may maintain the present suit in district court, but that the district court must refer the questions concerning the Accounting Procedures to the Interstate Commerce Commission. We hold further that the district court should retain jurisdiction over the cause, holding it in abeyance pending the referral to the Commission. E. g., Louisville & N. R. Co. v. Knox Homes Corp., 5 Cir. 1965, 343 F.2d 887.

Reversed and remanded.